159 A.3d 503

COMMONWEALTH of Pennsylvania, Appellee

v.

Raghunandan YANDAMURI, Appellant

No. 710 CAP

Supreme Court of Pennsylvania.

SUBMITTED: October 20, 2016

DECIDED: April 26, 2017

Stephen G. Heckman, Esq., Henry S. Hilles III, Esq., Standby Counsel for Appellant.

Raghunandan Yandamuri, pro se.

Daniel Clase Bardo, Esq., Robert Martin Falin, Esq., Montgomery County District Attorney's Office, Kevin R. Steele, Esq., Amy Zapp, Esq., PA Office of Attorney General, for Appellee.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

## OPINION

JUSTICE BAER

Appellant Raghunandan Yandamuri, acting *pro se*, appeals from two sentences of death imposed by the Montgomery County Common Pleas Court after a jury convicted him of two counts of first-degree murder and related offenses for the kidnapping of a ten-month-old baby and the murders of the

baby and her grandmother. For the reasons that follow, we affirm Appellant's sentences of death.[1]

## I. Background

Appellant is of Indian decent, is not a citizen of the United States, and holds an advanced degree in electrical and computer science engineering.[2] On October 20, 2012, Appellant attended a party with his wife in the Marquis Apartments located in King of Prussia, Montgomery County. Also present at the party were Chenchu and Venkata Venna, who had a ten-month-old daughter, Saanvi (hereinafter, "Baby"). Germane to this appeal, Baby's mother, Chenchu, was called "Latha" (hereinafter, "Latha" or "Mother") by close friends and family members, while Baby's father, Venkata, was called "Shiva" (hereinafter, "Shiva" or "Father"). During the evening, Mother told party goers that she had recently returned to work, and discussed the topic of grandparents babysitting the children of working parents. Mother also spoke about the gold jewelry that Baby was wearing. At one point during the party, Appellant held Baby.

Two days later, on October 22, 2012, Appellant returned to the Marquis Apartments wearing aviator glasses and a black hooded sweatshirt and knocked on the door of the Vennas' apartment. Baby's paternal grandmother, Satyavathi Venna (hereinafter, "Grandmother"), opened the door. Upon entering the apartment, Appellant brandished a four-inch knife in an attempt to kidnap Baby and hold her for ransom. When Appellant picked up Baby, a struggle ensued between Appellant and Grandmother. During the scuffle, Appellant fatally stabbed Grandmother in the throat so severely that the knife struck the bone three times.[3] To silence Baby's cries during the altercation, Appellant removed a handkerchief from his pocket and stuffed it in her mouth. When the handkerchief

1. This Court automatically reviews direct appeals from the imposition of death sentences pursuant to 42 Pa.C.S. § 9711(h)(1).

2. Appellant's nationality and citizenship are germane to issues raised in this appeal.

3. As discussed *infra,* the medical examiner testified that Grandmother also sustained stab wounds in her chest.

would not stay in place, Appellant removed a hand towel from the bathroom and tied it around Baby's head to prevent the handkerchief from falling out.

Appellant then went to the bedroom, removed a blue suitcase from the closet, and collected all of the gold jewelry, including the gold bangles from Grandmother's wrists. Appellant also placed Baby into the suitcase and exited the apartment, ultimately leaving Baby in the men's sauna inside the gymnasium in the Marquis Apartments. After showering at his apartment, Appellant discarded the suitcase in a dumpster at the Lafayette Valley Forge Apartments in King of Prussia. He then discarded some of the stolen jewelry by throwing it in the river and placed the rest of the jewelry in a bag, which he concealed behind a vending machine in his office building.

Meanwhile, during her lunch break, Mother attempted to call Grandmother, but got no response. Father returned home to investigate and found Grandmother's dead body and that Baby was missing. Father called the police who discovered ten copies of a ransom note, strewn across the floor of the apartment. The ransom note addressed "Latha" and "Shiva" (Mother and Father, respectively) as opposed to the Vennas' formal names, and stated, "Shiva, your daughter has been kidnapped. If you report this to cops your daughter will be cut into pieces and found dead.... By 8 p.m. today, Lata [sic] alone should get $50,000.00 cash and come to Baja Fresh at Acme store complex." Commonwealth Exhibit C–26; N.T., Sep. 30, 2014, at 44. Under police supervision and wearing a body wire, Mother proceeded to the Baja Fresh store as instructed, but the kidnapper never made contact. Law enforcement searched the apartment complex multiple times, but did not find Baby.

To determine the identity of the kidnapper, detectives asked the Vennas for a list of individuals who used their informal names of "Latha" and "Shiva." The Vennas provided such list, which included Appellant's name. Detectives Paul Bradbury and Andrew Rathfon attempted to interview Appellant on October 25, 2012, three days after the kidnapping, when Baby's whereabouts were still unknown. They discovered that

Appellant was at the Valley Forge Casino and made contact with him by asking casino security to escort him from the casino floor to a hallway where the detectives were waiting. The detectives, dressed in plain clothing, asked Appellant if he would accompany them to the Upper Merion Police Station to help with their investigation to find Baby. Without hesitation, Appellant voluntarily agreed and travelled to the station in Detective Bradbury's unmarked vehicle. The detectives informed Appellant that, after the questioning, they would return him to the casino to retrieve his car.

Upon arrival at the police station at 3:15 p.m., Appellant and the detectives proceeded downstairs to an office in the Detective Division. There was no security in the room and the door was closed for privacy reasons, but was not locked. The detectives told Appellant that they were seeking help in their investigation into Baby's kidnapping and informed him that he was free to leave and was not under arrest. The detectives also offered Appellant food and water and told him that he could go to the restroom unaccompanied when necessary. He accepted water, but not food.

Prior to the questioning, Detective Bradbury asked Appellant if he would consent to a search of the contents on his cell phone. Appellant agreed, executed the standard Montgomery County consent form, and gave his phone to the detectives. Appellant gave his first written statement between 3:27 p.m. and 6:03 p.m. pursuant to a question/answer format. He stated that on October 22, 2012, he had gone to work, went home for his lunch break around 11:30 a.m., and again returned home for the day around 1:30 p.m. after his wife had informed him of the incident. See Commonwealth Exhibit C-32; N.T. Sep. 30, 2014 at 103. He denied knowing who was responsible for the kidnapping and murder. During this questioning period, Appellant also consented to the search of his vehicle, which had been left at the casino. When the first written statement was completed, as occurred in connection with all subsequent written statements, Appellant was given an opportunity to review the statement, make corrections and/or additions, initial each page, and sign the document.

At approximately 6:30 p.m., upon the detectives' request, Appellant gave a second statement in a free flow format, which he later amended, describing his whereabouts and activities on the day of the murder with more detail than in his first statement. Commonwealth Exhibit C–34; N.T., Sep. 30, 2014, at 119. At about 7:30 p.m., Appellant executed a consent form, permitting a swab of the inside of his mouth to obtain a DNA sample. Appellant gave a third non-incriminating statement during the period from 7:37 p.m. to 8:07 p.m., which was conducted in a question/answer format, where the detectives asked Appellant follow-up questions regarding what he did at home during his lunch break on October 22, 2012. Appellant was reminded that he was free to leave and was not under arrest. Appellant took numerous breaks during the questioning, at which time he spoke about subjects unrelated to the offenses, including his Indian culture and his father. After each break, the detectives reminded Appellant that he was free to leave. Appellant never stated that he wanted the questioning to stop or that he desired counsel.

Appellant's fourth written statement was given from 8:50 p.m. through 9:25 p.m. Once again, Appellant was advised that he was free to leave and was not under arrest. Detectives asked him how he had cut his finger. Appellant responded that he scratched it while cleaning the trunk of his car the night before the incident and that his wife asked about his cut when he came home for lunch the next day. It was at this point that detectives asked Appellant to consent to a search of his apartment and to have his body photographed. Appellant agreed and executed the requisite consent forms at approximately 9:36 p.m.

Subsequently, during the period from 10:21 p.m. to 10:47 p.m., Appellant gave a fifth non-incriminating statement, expanding upon his previous comments regarding what occurred during his lunchbreak on October 22, 2012. At some point during the questioning, Detective Bradbury learned that Appellant's wife, who was pregnant at the time, contradicted his explanations of his whereabouts during the time the crimes were committed. Specifically, Appellant's wife told investiga-

tors that he did not come home for lunch on October 22, 2012, and that she was unaware of any cut on Appellant's finger. His suspicion raised and out of an abundance of caution, Detective Bradbury read Appellant *Miranda*[4] warnings at 11:03 p.m. Appellant waived his *Miranda* rights, both orally and by executing a written waiver form.

Shortly thereafter, Detective Bradbury told Appellant that either he or his wife had lied about his whereabouts on the afternoon of the murder and kidnapping. Appellant then asked for a pen and pad of paper to write down his thoughts and sat in silence on the other side of the office for approximately fifteen to twenty minutes. He drafted a sixth written statement between 2:04 a.m. and 2:17 a.m., wherein he wrote numerous times that he loved his wife, that he was completely helpless, and that people should believe him in the future if something happens to him. *See* Commonwealth Exhibit C–39; N.T., Sep. 30, 2014, at 162–63. At this point, Detective Bradbury asked for consent to search Appellant's computer, ipad, and flash drive. After executing the requisite consent forms, Appellant returned to the other side of the room and sat there by himself for several minutes.

Both detectives then walked over and confronted Appellant with the inconsistencies between his statements and the account given by his wife. Appellant repeatedly told the detectives that his wife must have been mistaken about his whereabouts on the day of the murder. In response, Detective Bradbury placed his hand on the bible and swore on his parents' grave that Appellant's wife was telling the truth. He then showed Appellant a picture of Baby, after which Appellant became emotional. At 3:45 a.m., Appellant asked Detective Bradbury to call his wife and inform her that he was okay. Detective Bradbury complied with this request. After the

4. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (providing that prior to custodial interrogation, the suspect must be advised that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to counsel, and that if he cannot afford counsel one will be appointed to him).

phone call, Detective Bradbury told Appellant that it was time for him to tell the truth.

Questioning resumed in a question/answer format, which resulted in Appellant's final written statement given during the period of 4:12 a.m. to 6:34 a.m., in which he confessed to the crimes. N.T., Sep. 30, 2014, at 171–87. Appellant stated that he did not intend to hurt anyone, but planned to kidnap Baby to get money from her parents because he knew they were both working. He explained that he had printed ten ransom notes from his office computer. Appellant stated that he entered the Vennas' apartment wearing a black hooded sweatshirt and black aviator glasses and carried a four-inch knife from his kitchen that had a black handle and a silver blade. He indicated that he threw the ransom notes in the Vennas' hallway and stabbed Grandmother in the throat with his right hand because she came at him while he was holding Baby. Appellant indicated that Baby was wearing a white dress and that he tried to get her to stop crying by placing a handkerchief in her mouth and a bath towel around her head to keep the handkerchief in place. Appellant disclosed that he then placed Baby in the blue suitcase along with the jewelry he had stolen from the apartment and left via the fire escape. He stated that he placed Baby in the steam bath portion of the men's room in the apartment complex gym and disposed of the suitcase, knife, and clothing worn during the attack in a large green dumpster at the Lafayette Valley Forge apartments. Appellant indicated that he returned to work and stayed there until his wife called when she heard about the incident, at which time he went home to her. Finally, Appellant stated that he threw some of the stolen jewelry into the river near Route 422 West, and placed the remaining jewelry in a bag behind a Coke machine in the fourth floor cafeteria of his work place.

At the conclusion of his written statement, Appellant consented to having the statement both video and audio-recorded, which began at approximately 7:11 a.m. and concluded at approximately 7:31 a.m. During the video, Appellant reiterated the information given in his written statement and demonstrated how he stabbed Grandmother while using a plastic

knife. *See* Commonwealth Exhibit 43. He explained that the stabbing of Grandmother happened accidentally, and he expressed remorse. Following the video, Appellant was given the opportunity to speak with his wife, who was brought to the police station.[5]

After the video statement, Appellant was taken to a holding cell at the police station where he requested to speak to Detective Bradbury. Appellant thereafter told Detective Bradbury for the first time that two "white guys," one of whom was named "Josh," had followed him from the casino and forced him to participate in the kidnapping. Detective Bradbury did not ask Appellant any further questions, but merely left the cell. Later that afternoon, a criminal complaint was filed charging Appellant with two counts of first-degree murder, two counts of second-degree murder, kidnapping, burglary, robbery, theft by unlawful taking or disposition, and abuse of a corpse. At about 3:15 p.m. that afternoon, Appellant was arraigned.[6]

Three days later, on October 29, 2012, Appellant called Detective Bradbury from prison to again tell him that the two white men were the actual killers. Contrary to his statement in the holding cell, Appellant stated that he did not know either of the white men's names. He reiterated that the men had guns and a key to his apartment, and that they threatened to harm his wife if he did not cooperate in the kidnapping. Appellant subsequently wrote Detective Bradbury a twenty-four page letter, repeating the same claim. Commonwealth Exhibit 44; N.T., Sep. 30, 2014, at 203–33. In the letter, Appellant indicated that the two white men needed someone familiar to the Vennas to gain entrance into the residence. Appellant identified one of the white men only as "Matt" who

---

5. After obtaining Appellant's confession, police searched the men's sauna at the Marquis Apartments and found Baby's dead body. They also searched behind the vending machine at Appellant's workplace and retrieved the Vennas' stolen jewelry. Finally, the police went to the dumpster where Appellant said he discarded the items used in the crimes, but found no evidence as the trash had already been retrieved.

6. Following his arraignment, Appellant was given the opportunity to speak with the Indian consulate office.

was purportedly tall and had a bald head and glasses. Notwithstanding that Appellant had previously identified one of men as "Josh," Appellant did not reference "Josh" in the lengthy letter, but rather only described the second man as having had gold hair and a beard. Appellant further stated in the letter that he confessed to the crimes only out of fear that the real perpetrators would harm his wife if he told the truth.

Appellant subsequently filed various pre-trial motions including a motion to suppress the several statements he made to the detectives as well as his consents to search. Suppression hearings were held on December 30, 2013, January 2, 2014, and January 13, 2014, during which the trial court heard testimony from Detective Bradbury and Appellant. The trial court denied Appellant's motion to suppress by order dated April 21, 2014, and incorporated those findings of fact and conclusions of law that the court articulated on the record during the proceeding conducted on April 17, 2014.

Specifically, the trial court found that: Detective Bradbury's testimony was "completely credible" and his questioning methods were not improper; Detective Bradbury read Appellant his *Miranda* rights and Appellant waived such rights validly; and Appellant did not invoke his right to silence or ask for an attorney. N.T., Apr. 17, 2014, at 77–78. The trial court also found that throughout the entire questioning, Appellant never appeared to be overcome by exhaustion, emotion, or any kind of adverse physical effects and that Detective Bradbury did not threaten, make promises, or use force to obtain Appellant's cooperation but, rather, treated him with courtesy and respect. The trial court concluded that Appellant was not placed in custody until after he completed his confessions to the murders, at which time *Miranda* warnings had already been administered and Appellant had validly waived them. *Id.* at 80. Accordingly, the trial court held that the police legally obtained the written statements taken throughout the day, the video statement, and the various consent forms Appellant executed. *Id.* at 81.

Appellant thereafter filed a motion for waiver of counsel and a motion to proceed *pro se*, alleging that he was unsatisfied

with his counsel's representation and believed that he could better represent himself. Following a hearing and colloquy on May 16, 2014, the trial court concluded that Appellant knowingly, voluntarily, and intelligently waived his right to counsel and permitted him to proceed *pro se*. The court appointed Attorney Stephen G. Heckman as standby counsel and Attorney Henry S. Hilles, III, remained as penalty phase counsel.[7]

At trial, which began on September 25, 2014, the Commonwealth presented the testimony of Detective Bradbury, who explained in great detail Appellant's questioning, his voluntary cooperation, and his ultimate confession to the offenses. The Commonwealth presented evidence corroborating specific assertions made in Appellant's confession, such as testimony establishing that Baby's body was recovered in the men's sauna at the Marquis Apartments, that ten ransom notes were found at the crime scene, and that the Vennas' stolen jewelry was discovered behind a vending machine in Appellant's office building. Further, the Commonwealth presented the testimony of Dr. Paul Hoyer, a forensic pathologist who performed the autopsies of the victims and opined that the victims' deaths were consistent with the manner of death described by Appellant in his confession. Finally, relating to motive, the Commonwealth presented testimony that Appellant had borrowed money from friends shortly before the murders to obtain visiting visas for his in-laws, but later lost a large sum of money gambling at the Valley Forge Casino.

Appellant testified on his own behalf in narrative form as he was acting *pro se*. Appellant denied killing the victims and, instead, suggested that two white men had robbed him and forced him to assist in the commission of the crimes.[8] He admitted that he was forced to: disclose the Vennas' informal

7. Immediately prior to the commencement of trial, the trial court informed Appellant that standby counsel was prepared to represent him and again explained the information contained in the waiver of counsel form. N.T., Sep. 25, 2014, at 5–22. Thereafter, Appellant again indicated that he desired to represent himself and signed the waiver of counsel form. *Id.* at 22.

8. Appellant referenced one of the men as "Matt," but did not elaborate on his identity.

names of "Latha" and "Shiva," N.T., Oct. 7, 2014, at 135; write the ransom note, *id.* at 132; take the two white men to the Vennas' apartment through the fire escape, *id.* at 138; and remove the gold bangles from Grandmother's body after the stabbing. *Id.* at 153, 221. Appellant insisted that he did not kill either victim, but rather observed one of the two white men stab Grandmother. He further provided the jury with his account of the questioning conducted by Detectives Bradbury and Rathfon, suggesting that his statements were not made voluntarily as he only confessed because he feared the real killers, feared his wife may be arrested, and did not understand the *Miranda* warnings or the consent forms. Appellant explained that he tried to inform the detectives about the real killers, but the detectives would not believe him. Additionally, Appellant presented character evidence establishing that he has a good reputation for being a law-abiding, peaceful, and nonviolent individual.[9]

Following trial, the jury convicted Appellant of two counts of first degree murder, kidnapping, burglary, robbery, and abuse of corpse. Following the penalty proceeding, during which Appellant was represented by counsel, the jury returned two verdicts of death. For the first-degree murder of Baby, the jury found four aggravating circumstances and three mitigating circumstances and concluded that the former outweighed the latter.[10] Relating to the first degree murder of

9. Forensic evidence presented at trial neither excluded nor confirmed Appellant as the perpetrator. The parties stipulated that, pursuant to DNA analysis, Appellant could not be excluded as a potential male contributor to the DNA obtained from Grandmother's fingernails; N.T., Oct. 2, 2014, at 139; no latent fingerprints were recovered from the crime scene, *id.* at 142; and three hairs found on the ransom note and on Baby's body and dress could not have come from Appellant. *Id.* at 143.

10. The four aggravating circumstances found in relation to Baby's murder were: holding the victim for ransom, 42 Pa.C.S. § 9711(d)(3); commission of the killing during the perpetration of a felony, *id.* § 9711(d)(6); conviction of another federal or state offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment was imposable, *id.* § 9711(d)(10); and the victim was a child under twelve years of age, *id.* § 9711(d)(16). The mitigating circumstances found were: no significant history of prior criminal convictions, *id.* § 9711(e)(1); extreme mental or emotional disturbance,

118

Grandmother, the jury found two aggravating circumstances and concluded that they outweighed the same three mitigating circumstances found in relation to Baby's murder.[11] The trial court formally sentenced Appellant to death on November 20, 2014. By opinion dated February 20, 2016, the trial court rejected the twenty issues Appellant presented in his Pa. R.A.P. 1925(b) statement of matters complained of on appeal.

## II. Sufficiency of the Evidence

 Although not challenged by Appellant, as in every case where a death sentence has been imposed, we begin by conducting an independent review of the sufficiency of the evidence to sustain the convictions for first-degree murder. *Commonwealth v. Woodard*, 634 Pa. 162, 129 A.3d 480, 489 (2015); *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n.3 (1982). "In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the fact finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt." *Woodard*, 129 A.3d at 489–90 (citing *Commonwealth v. Fears*, 575 Pa. 281, 836 A.2d 52, 58–59 (2003)). It is well-established that the Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence and the jury, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence.

*id.* § 9711(e)(2); and any other evidence of mitigation concerning Appellant's character and record and the circumstances of his offense. *Id.* § 9711(e)(8).

11. The two aggravating circumstances found in relation to Grandmother's murder were: commission of the killing during the perpetration of a felony, *id.* § 9711(d)(6), and conviction of another federal or state offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment was imposable. *Id.* § 9711(d)(10). The jury found the same mitigating factors as it found for the murder of Baby. *See* n.10, *supra*.

*Commonwealth v. Poplawski*, 634 Pa. 517, 130 A.3d 697, 709 (2015).

 First–degree murder is an intentional killing, a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a), (d). To prove first-degree murder, the Commonwealth must establish beyond a reasonable doubt that: (1) a human being was killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and the specific intent to kill. *Poplawski*, 130 A.2d at 709. The jury may infer the intent to kill based upon the defendant's use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Sanchez*, 623 Pa. 253, 82 A.3d 943, 967 (2013).

 Upon careful review of the record, we conclude that the Commonwealth presented sufficient evidence at Appellant's trial to support his convictions for the first-degree murder of Baby and Grandmother. When viewed in the light most favorable to the Commonwealth as verdict winner, the evidence establishes that Appellant confessed to the killings in a written statement as well as a video-taped statement, wherein he confirmed that he entered the Vennas' apartment with an intent to kidnap Baby and hold her for $50,000 ransom, stabbed Grandmother in the throat when she showed resistance, and silenced Baby's cries by stuffing a handkerchief in her mouth, tying a bath towel around her head to keep the handkerchief in place, putting Baby in a suitcase, and ultimately abandoning her in the sauna.

The testimony of Dr. Paul Hoyer, the forensic pathologist who performed the autopsies of the victims, established that the victims' causes of death were consistent with the descriptions given by Appellant in his confession. Dr. Hoyer opined that Grandmother's cause of death was multiple cut, stab, and chop wounds to the neck inflicted by a knife, and that the manner of death was homicide. N.T., Oct. 2, 2014, at 153. He explained that Grandmother sustained three different wounds to her neck, with the knife travelling three inches, resulting in three "chops" to her spinal column, *id.* at 159, that severed vital areas of her body including her carotid arteries, jugular arteries, trachea and esophagus. *Id.* at 161. Further, Dr. Hoyer stated that Grandmother also suffered at least three chest stab wounds, which had been inflicted later in time than

the neck wounds. *Id.* at 165–66. Based on the injuries observed, he opined that the type of knife used in the attack was a single-edged, ordinary-sized knife. *Id.* at 167. He also identified defensive wounds on Grandmother's hands. *Id.* at 167–68.

Dr. Hoyer further testified that the cause of Baby's death was asphyxia or an inability to breathe and that the manner of death was homicide. *Id.* at 171, 175. He found that there was a soft suffocation, meaning that there was some sort of mechanical obstruction to breathing such as something pressing on the child's chest, or mouth, or that something was in her mouth that prevented her from breathing. *Id.* at 172. Dr. Hoyer indicated that a soft suffocating death could arise if one put a handkerchief in the child's mouth, wrapped a towel around the child's head, and then placed the child in a suitcase. *Id.* 173–74. He opined that Baby had died three days prior to when her body was found, which would have been the day of the kidnapping. *Id.* at 174. Dr. Hoyer confirmed that all of his opinions were given to a reasonable degree of medical certainty. *Id.* at 175.

As noted, the Commonwealth additionally presented evidence corroborating specific details of Appellant's confession, such as testimony establishing that Baby's body, clad in a white dress, was recovered where Appellant had confessed to leaving it, in the men's sauna at the Marquis Apartments, N.T., Oct. 1, 2014, at 198–99; N.T., Oct. 2, 2014, at 42; that ten ransom notes were found at the Vennas' apartment, *id.* at 12–13; and that the jewelry stolen during the incident was found behind a vending machine in Appellant's office building. N.T., Oct. 3, 2014, at 99–100. Finally, the Commonwealth presented testimony that Appellant had borrowed money from friends shortly before the murders to obtain visiting visas for his in-laws, but later lost a large sum of money gambling at the Valley Forge Casino.

When this evidence is viewed in the proper light, it is sufficient to establish beyond a reasonable doubt that Baby and Grandmother were killed, that Appellant was responsible for the killings, and that he acted with malice and the specific intent to kill both victims. While the jury was free to believe

Appellant's theory that two men forced his limited participation in these crimes, its verdict indicates that it did not do so.[12]

We now turn to the various issues presented in Appellant's brief.

### III. Standard and Scope of Appellate Review

 As the majority of Appellant's contentions challenge the trial court's suppression ruling, we begin by emphasizing that our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *Woodard*, 129 A.3d at 498. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. *Commonwealth v. Galvin*, 603 Pa. 625, 985 A.2d 783, 795 (2009). Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. *Poplawski*, 130 A.3d at 711. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial. *In the Interest of L.J.*, 622 Pa. 126, 79 A.3d 1073, 1085 (2013).[13]

12. The subject of the two white men identified by Appellant only as "Matt" and "Josh" was explored when Appellant called Detective Bradbury as a defense witness and asked him why he failed to follow up on leads that Appellant had given him regarding the "real killers." Detective Bradbury responded, "I would have chased Matt and Josh to the gates of hell if I thought they were involved in this, but there was no evidence then, there's no evidence now, and there never will be any evidence that they were involved." N.T., Oct. 6, 2014, at 118.

13. When this Court decided *L.J.* on October 30, 2013, we declared that our holding, limiting the scope of review of a suppression ruling to the suppression hearing record, was to be applied prospectively. 79 A.3d at 1088–99. Appellant's suppression hearings occurred thereafter in December of 2013 and January of 2014. While Appellant offers no objection to prospective application of the Court's decision in *L.J.*, he claims that *L.J.* was wrongly decided as it prevents a defendant from relying on trial evidence to establish that the Commonwealth presented false evidence during the suppression hearing. To the extent Appellant's

### IV. Suppression Based on Illegal Arrest at Casino

Appellant contends that his initial encounter with Detectives Bradbury and Rathfon at the Valley Forge Casino on October 25, 2012, constituted an illegal arrest unsupported by probable cause and, thus, all statements resulting from the subsequent police questioning should have been suppressed.[14] In support thereof, Appellant asserts that the detectives: had casino security personnel and a state policeman escort him from a gaming table to a private hallway restricted for casino employees; precluded him from cashing in his chips; failed to return his casino player's card; prohibited him from driving to the police station in his own vehicle; held his cell phone during the drive to the police station; and denied his requests to call his pregnant wife and answer her incoming call. Appellant argues that a reasonable person under similar circumstances would not have felt comfortable terminating the encounter at the casino and, instead, would have complied with the detectives' request to accompany them to the police department solely out of fear. Accordingly, he contends, all evidence stemming from the illegal detention at the casino, including his inculpatory written and video-taped statements given later at the police station, should have been suppressed.

The Commonwealth refutes Appellant's claim that he was illegally arrested at the casino. It submits that Appellant was not in custody until he was formally arrested after he complet-

argument is preserved, considering that he did not forward such contention in the trial court, we find his interpretation of *L.J.* flawed as that decision does not preclude a defendant from challenging a suppression ruling at trial based upon evidence that was unavailable when the suppression hearing took place. *See id.*, at 1084 (acknowledging an exception to the generally limited scope of review of a suppression ruling pursuant to Pa.R.Crim.P. 581(J), where evidence that was not available at the time of the suppression hearing can be admissible at trial to challenge a prior adverse suppression ruling). Accordingly, while we address and ultimately reject Appellant's false evidence claim *infra* at 526–27, we note at this juncture that Appellant's challenge to *L.J.* does not entitle him to relief in this appeal as it is based on a flawed interpretation of that decision.

14. Although Appellant invokes both the United States and Pennsylvania Constitutions in connection with his suppression claims, he does not argue that a different standard should be applied under the Pennsylvania Constitution.

ed his voluntary confession to police at approximately 7:31 a.m. the following day. The Commonwealth characterizes what occurred at the casino as a mere encounter as Appellant agreed voluntarily to assist in the investigation of Baby's kidnapping. The Commonwealth concludes that, because Appellant was not in custody or deprived of his freedom in any way at the casino, his subsequent statements should not be subject to suppression on this basis.

The trial court agreed with the Commonwealth, expressly crediting Detective Bradbury's suppression hearing testimony. The court found that two casino security officers and a Pennsylvania State Policeman made contact with Appellant at the blackjack table and asked him to come into the hallway; that Detective Bradbury then asked Appellant if he would help in the investigation of Baby's kidnapping by coming to the police station to answer questions; that without hesitation, Appellant said yes; that none of the officers told Appellant that he was required to speak with them, none of them were in uniform, and no badges or weapons were displayed; that prior to exiting the casino, Appellant asked to cash out his chips, which a casino employee did for him; that the detectives informed Appellant that they would drive him to the police station and return him to his vehicle when the questioning was concluded; that Appellant was not restrained while travelling in Detective Bradbury's unmarked vehicle; and that Appellant consented to Detective Bradbury holding his cell phone during the ride and the phone was returned to him upon arriving at the police station without the detectives examining its contents. Based on the totality of these circumstances, the trial court concluded that Appellant was not under arrest or otherwise in custodial detention as a reasonable person in his circumstances would have felt free to decline the detectives' requests.

Upon careful review, we conclude that the facts as found by the suppression court are supported by the record and that the legal conclusions drawn from those facts are correct. We agree with the trial court that Appellant was not arrested or illegally detained at the casino, and thus, the trial court did not err by refusing to suppress his subsequent

statements made to the detectives at the police station, as they were not "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (holding that, where the police detained and arrested a person without probable cause, the detention and arrest were illegal and all statements and evidence collected as a result of the illegality must be suppressed as fruit of the poisonous tree).

 "The standard for determining whether police have initiated a custodial interrogation or an arrest is an objective one, with due consideration given to the reasonable impression conveyed to the person interrogated rather than the strictly subjective view of the troopers or the person being seized." *Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078, 1085–86 (1993). An arrest exists when the police intended to take the defendant into custody and the defendant was subjected to the actual control and will of the police. *Commonwealth v. Lovette*, 498 Pa. 665, 450 A.2d 975, 978 (1982). A person is in custody when he is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. *Woodard*, 129 A.3d at 499 n.10 (citing *Commonwealth v. Johnson*, 615 Pa. 354, 42 A.3d 1017, 1028 (2012)).

As the trial court emphasized, Appellant agreed, without hesitation, to accompany the detectives to the police station to assist in the investigation of Baby's kidnapping, N.T., Dec. 30, 2013, at 22, and none of the officers told Appellant that he was required to speak with them, none of the officers were in uniform, and no badges or weapons were displayed. *Id.* at 16. The fact that casino security personnel and the plainclothes state trooper initially asked Appellant to come to the hallway where the detectives were located did not impede Appellant's freedom of movement or suggest that he was required to comply with the detectives' request. Similarly, that the detectives drove Appellant to the police station in an unmarked vehicle, briefly held his cell phone during the ride to the station, and possessed his casino player's card, did not individually, or in the aggregate, suggest that Appellant was under

formal compulsion to respond.[15] Accordingly, the trial court's conclusion that Appellant was not in custody or arrested at the casino was correct. *See Commonwealth v. Williams*, 539 Pa. 61, 650 A.2d 420, 427 (1994) (holding that the defendant's freedom of movement had not been restricted and that he was not in custody when police officers asked him to accompany them and give a statement); *Edmiston*, 634 A.2d at 1086–87 (holding that the defendant's voluntary appearance at the police barracks to answer questions regarding a missing child constituted a mere encounter in which he was under no official compulsion to respond).

## V. Suppression Based on Absence of *Miranda* Warnings

As noted, Appellant arrived at the Upper Merion Police Station at approximately 3:15 p.m. and was not advised of his *Miranda* rights until 11:03 p.m. He argues that because he was subjected to custodial interrogation during this time without receiving Miranda warnings, the various statements he gave to detectives (which outlined his whereabouts at the time of the murder/kidnapping, but did not expressly inculpate him in the crimes) should have been suppressed. He concedes that the detectives repeatedly advised him that he was not in custody and that he was free to leave. Appellant contends, however, that the totality of the circumstances demonstrates that he was unable to leave because the detectives retained his car keys and cell phone and a police officer's badge was required to exit the building. He further submits that, during this period, the detectives denied his numerous requests to call his pregnant wife, which rendered him "incommunicado by blocking contact with the outside world." Brief for Appellant at 40. In Appellant's view, no reasonable person in his situation would have felt free to leave. *See* Brief for Appellant at 42 (citing *Commonwealth v. Brown*, 473 Pa. 562, 375 A.2d 1260,

---

**15.** The record does not establish that the detectives seized Appellant's casino player's card from him, but suggests only that the detectives failed to return the card after casino personnel had taken it from Appellant and given it to police. *See* N.T., Jan. 2, 2014, at 108–10 (referencing Appellant's suppression hearing testimony establishing that casino personnel had taken his player's card and had given it to the police).

1265 (1977), for the proposition that an extended station house interrogation creates a reasonable belief in the person being interrogated that his freedom of action is restrained)); *see also* Brief for Appellant at 39 (citing *Commonwealth v. Di-Stefano*, 782 A.2d 574, 582 (Pa. Super. 2001), for the proposition that an officer's statement that the defendant could leave if he told the truth did not preclude a finding of custodial interrogation where the defendant could not leave as a practical matter as the police possessed his car keys).

The Commonwealth disputes Appellant's contention that he was subject to custodial interrogation during the period at issue and reiterates that Appellant was not in custody until he was formally arrested several hours later, following his voluntary confession. It emphasizes that Appellant: was not handcuffed during the questioning; was repeatedly reminded that he was free to leave; was permitted to roam around the unlocked room; was offered food, water, and access to the restroom; did not indicate any discomfort while being questioned; and, indeed, confirmed that the officers had treated him well. Thus, the Commonwealth concludes that the trial court did not err in denying suppression of the statements made during this period based upon the absence of *Miranda* warnings.

The trial court agreed with the Commonwealth, again crediting Detective Bradbury's suppression hearing testimony. The court found: that Appellant's questioning did not occur in an interrogation room, but rather in an office with two desks; that the door was closed for privacy reasons, but was not locked; that Appellant was offered food and drink; that Appellant was permitted to leave the room unaccompanied to use the restroom; and, significantly, that Appellant was not restrained and was repeatedly advised that he was free to leave and was not under arrest. While the court did not address specifically the retention of Appellant's car keys and cell phone, it acknowledged that, during this period, Appellant consented to searches of his car, cell phone, apartment, laptop, and flash drive as well as a DNA buccal swab and photographing of his body.

The court emphasized that Appellant never indicated that he wanted to leave, never asked for an attorney, and never requested that the officers stop the questioning. It further noted that Appellant was given an opportunity to review each statement and make corrections or additions, and he initialed each answer and signed the bottom of every page. The court found that there were several breaks in the questioning where Appellant and the detectives discussed topics unrelated to the kidnapping/murder, such Appellant's Indian culture and his father. The trial court noted that Detective Bradbury's interrogation approach changed when he received information that Appellant's wife contradicted his statements concerning his whereabouts during the time of the murder, leading Detective Bradbury to advise Appellant of his *Miranda* rights at 11:03 p.m. Based on the totality of these circumstances, the trial court concluded that Appellant was not subject to custodial interrogation from 3:15 p.m. through 11:03 p.m. and, thus, all statements given during that time were voluntary and gratuitous.

The United States Supreme Court has held that, before law enforcement officers question an individual who has been in taken into custody or has been deprived of his freedom in any significant way, the officers must first warn the individual that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed. *Miranda*, 384 U.S. at 478–79, 86 S.Ct. 1602. However, these special procedural safeguards are required only where a suspect is both taken into custody and subjected to interrogation. *Commonwealth v. Bland*, 631 Pa. 644, 115 A.3d 854, 857 (2015) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). In determining whether a suspect is in custody, two discrete inquiries are essential: (1) an examination of the circumstances surrounding the interrogation; and (2) a determination of whether, given those circumstances, would a reasonable person have felt that he or she was at liberty to terminate the interrogation and leave. *J.D.B.*

*v. North Carolina*, 564 U.S. 261, 270, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011) (citations omitted). As noted, a person is in custody for *Miranda* purposes only when he is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. *Woodard*, 129 A.3d at 499 n.10. Statements not made in response to custodial interrogation are classified as gratuitous and not subject to suppression for lack of Miranda warnings. *Commonwealth v. Whitley*, 500 Pa. 442, 457 A.2d 507, 508 (1983). Whether an encounter is deemed "custodial" must be determined by examining the totality of the circumstances. *Edmiston*, 634 A.2d at 1086.

 Initially, we agree with Appellant that a law enforcement officer's statement to the suspect that he is free to leave does not, in and of itself, preclude a finding that the suspect is in custody. *See Brown*, 375 A.2d at 1265 n.6. (stating that the mere fact that the defendant was told that he was not under arrest did not mean that he was never subjected to custodial interrogation). We reject, however, Appellant's contentions that he could not exercise his freedom of movement because the detectives had retained his car keys and cell phone, he could not exit the building without an officer's badge, and he was precluded from contacting his wife.

A reasonable person in Appellant's situation would not view the detectives' acquisition of his car keys and cell phone as restricting his freedom to end the encounter because Appellant himself provided these items to the detectives and executed voluntary consent forms permitting the officers to search his cell phone and car.[16] Notably, Appellant cites to no portion of the record establishing that the detectives denied his requests for the return of his cell phone and car keys so that Appellant could stop the interview and leave the police station. To the contrary, the record indicates that Appellant never stated that he wanted to leave, never asked to stop the questioning, and never refused to answer questions. N.T., Dec.

16. Appellant does not present an issue in this appeal challenging the consensual searches of his cell phone and car.

30, 2013, at 90, 100, 102, 108; N.T., Jan. 2, 2014, at 5. Had Appellant made such requests and been refused, an examination of the totality of the circumstances may have supported a finding of custodial interrogation. *See Commonwealth v. Di-Stefano*, 782 A.2d 574, 582 (Pa. Super. 2001) (finding that the defendant was held in custodial interrogation where the defendant was detained at the police station for eleven hours over night, his vehicle keys were taken and not returned, and he indicated a desire to leave, but was refused).

Additionally, Appellant's contention that he could not exit the police station without displaying an officer's badge is unsupported. The record establishes that the door to the office in which Appellant was being questioned was closed for privacy reasons, but not locked. Further, while the record suggests that the detectives and Appellant entered the police station through a private back door, *see* N.T., Jan. 2, 2014, at 111–12; N.T., Jan. 13, 2014, at 56, Appellant points to no evidence establishing that a badge was required to leave the building or that the private back door was the exclusive exit. Finally, we do not view Appellant's purported inability to call his wife as a significant restriction on his freedom of movement as the circumstances indicate that Appellant could have heeded the detectives' directive that he was free to leave and gone home to speak with his wife or check on her welfare.

Considering the totality of the circumstances surrounding Appellant's questioning during the period from 3:15 p.m. through 11:02 p.m., we conclude that, consistent with Detective Bradbury's repeated directive that Appellant was free to leave and was not under arrest, a reasonable person would have felt that he was at liberty to terminate the interrogation and leave. Accordingly, we hold that the record supports the trial court's factual findings regarding the circumstances surrounding Appellant's interrogation and that the trial court was correct in concluding that Appellant was not in custody during the challenged time period, thus, his statements to the detectives were gratuitous and not subject to suppression for lack of *Miranda* warnings.

## VI. Suppression Based on Illegal Arrest at 11:03 p.m.

 Appellant next argues that he was arrested without probable cause at 11:03 p.m. when *Miranda* warnings were administered and that his subsequent confession must be suppressed under the Fourth Amendment to the United States Constitution as the product of this illegal arrest. In support of this contention, Appellant asserts that he had been subjected to eight hours of questioning by this time and had told the detectives that he wanted to go home and/or speak with his wife, but was not allowed to leave or call his wife. He reiterates his previous claims that he did not have possession of his car keys and cell phone, was never provided food, and could not exit the police station without a badge. Appellant further places great emphasis on an inconsistency between Detective Bradbury's suppression testimony and the detective's trial testimony regarding whether the detective held a subjective, unexpressed belief that Appellant was free to leave after *Miranda* warnings were given.[17] From these allegations, Appellant concludes that he was under arrest at 11:03 p.m. when *Miranda* warnings were administered, which arrest was unlawful as there was no evidence revealed at that time establishing that he had engaged in any criminal activity.

Appellant further asserts that the administering of Miranda rights was insufficient to purge the taint of the Fourth Amendment violation resulting from the illegal arrest. *See* Brief of Appellant at 52–53 (citing *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (holding that, while an inculpatory statement given after *Miranda* warnings may be voluntary under the Fifth Amendment's privilege

17. During the suppression hearing, Detective Bradbury testified that when *Miranda* warnings were administered at 11:03 p.m., Appellant was not under arrest and was free to leave. N.T., Dec. 30, 2013, at 92. When questioned on direct examination by the Commonwealth at trial, the detective reiterated that Appellant was not in custody after *Miranda* warnings were given. N.T., Sept. 30, 2014, at 156. However, when called as a defense witness by Appellant, Detective Bradbury stated for the first time that he did not believe Appellant was free to leave after *Miranda* warnings were given. N.T., Oct. 6, 2014, at 83. Detective Bradbury did not testify that he informed Appellant of this particular belief at any point during the interrogation.

against self-incrimination, the statement violates the Fourth Amendment's protection against unreasonable searches and seizures if the defendant's arrest was illegal and there was an insufficient attenuation between the unlawful arrest and the statement)). The Commonwealth's only rebuttal to this issue is its assertion that Appellant was not arrested until he voluntarily confessed to the offenses several hours after *Miranda* warnings were given.

The trial court found that Appellant's Fourth Amendment claim was belied by the record because, even after providing him with *Miranda* warnings, the police continuously reminded Appellant that he was free to leave. Further, the court concluded, the physical environment did not change in any way after Appellant waived his *Miranda* rights in that he was still unrestrained and able to take breaks unaccompanied by the detectives. Thus, the trial court concluded, a reasonable person in Appellant's position at that point in time would have continued to feel free to end the interrogation and leave the police station, notwithstanding the detectives' cautionary provision of *Miranda* warnings. The trial court rejected Appellant's reliance upon inconsistencies in Detective Bradbury's suppression testimony and trial testimony, holding that Detective Bradbury's subjective view as to whether Appellant was free to leave was irrelevant to the inquiry of whether a reasonable person in Appellant's position would have felt free to leave. The trial court concluded that even if Appellant was under arrest at that time, he was advised of his *Miranda* rights and voluntarily and intelligently waived them.

Appellant is not entitled to relief on this claim. Having already concluded that Appellant was not in custodial interrogation for purposes of *Miranda* immediately prior to 11:03 p.m., we agree with the trial court that the administering of *Miranda* warnings at that time did not transform the detectives' noncustodial questioning of Appellant into an arrest. Even after the officers informed Appellant of his *Miranda* rights, Appellant was offered food and drink, went to the restroom unaccompanied, was free to leave and was not under

arrest, and never indicated that he wanted to leave or stop the questioning. N.T., Dec. 30, 2013, at 74, 79, 90, 92.

Additionally, the trial court was correct in holding that Detective Bradbury's trial testimony regarding his unexpressed subjective belief as to whether Appellant was free to leave after *Miranda* warnings were administered has no relevance to the custody inquiry. *See Stansbury v. California*, 511 U.S. 318, 324, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (holding that a law enforcement officer's unarticulated subjective belief as to whether the person being questioned is a criminal suspect is irrelevant to the custody determination because a custody assessment depends on the objective circumstances of an interrogation). Further, consideration of Detective Bradbury's trial testimony is outside this Court's scope of reviewing a suppression ruling. *See In the Interest of L.J.*, 79 A.3d at 1085 (limiting appellate scope of review of a suppression ruling to the record of the suppression hearing).

Accordingly, we conclude that Appellant was not placed under arrest until he completed his confession the following day, after having waived his *Miranda* rights. Thus, the premise underlying the instant suppression claim, *i.e.*, that Appellant was illegally arrested at 11:03 p.m., is false and suppression of Appellant's subsequent inculpatory statement on Fourth Amendment grounds is unwarranted.

## VII. Suppression Based on Involuntariness of Confession

While we have determined that Appellant was not in custodial interrogation when he made his statements to the detectives, his confession may still be deemed inadmissible on the ground that it was not voluntarily given. *See Commonwealth v. Nester*, 551 Pa. 157, 709 A.2d 879, 882 (1998) (citation omitted) (recognizing that it is possible for a non-custodial interrogation to result in an involuntary confession); *see also J.D.B.*, 564 U.S. at 268, 131 S.Ct. 2394 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)) (holding that due process precludes admission of a

confession where a defendant's will was overborne by the circumstances of an interrogation).

■ Appellant contends that his confession should have been suppressed as involuntary because it was the result of "psychological manipulation, coercion, promises, and threats." Brief for Appellant at 57. In support of this claim, Appellant reiterates his previous assertions that the detectives illegally detained him, held his car keys and cell phone, declined to allow him to call his wife, and did not provide food. Appellant further asserts that his confession was involuntary because Detective Bradbury: continuously questioned him throughout the approximately 16–hour detention period (from 3:15 p.m. on October 25th through 7:31 a.m. the following day); did not offer him an opportunity to sleep; promised on the bible and his dead parents' graves that Appellant was lying about his whereabouts at the time of the murder; threatened that his wife could be arrested if she gave false information to the police; threatened that Appellant could be arrested for possible insurance fraud in connection with an unrelated car accident; placed Baby's pictures in front of him to elicit an emotional response; and promised Appellant that he could meet with his wife and have breakfast with her if he confessed. He contends that his written statements during the questioning demonstrated that he was in an altered psychological state as he indicated that he was "completely helpless" and that people should believe him in the future if something happens to him. As further evidence of the involuntariness of his confession, Appellant cites the fact that he expressed unwillingness to cooperate with the detectives by sitting silently on the floor in the corner of the room for an extended period of time.[18]

The Commonwealth responds that the facts as found by the suppression court, which are supported by the record, establish that Appellant's statements were freely and voluntarily

18. Finally, Appellant contends that his statement was involuntary due to an unnecessary delay between his arrest and arraignment. For the reasons set forth in Part X *infra*, we find that any delay in Appellant's arraignment did not affect the voluntariness of his confession.

given to the detectives and were not derived from illegal police
misconduct or undue delay. Under the totality of the circum-
stances analysis, the Commonwealth maintains, nothing about
Appellant's interactions with the police indicates coercion as:
he was notified that he was free to leave at the beginning of
the interview and was repeatedly informed so as the interview
continued; he voluntarily answered questions and was not
arrested until after confessing to the crimes; he was not
questioned during the entirety of the time spent in the police
station; his movements were not restricted; he was adminis-
tered and waived his *Miranda* rights; he provided written
consent prior to recording the video statement; and he admit-
ted in his statement that the detectives had treated him well
throughout the entire interview.

The trial court agreed with the Commonwealth and held
that Appellant's confession was voluntarily made. It relied on
the facts demonstrating that: Appellant's questioning was not
continuous and numerous breaks were taken during which
Appellant discussed unrelated topics; Appellant was not in-
jured or ill during his interview; he was offered both food and
drink, although only accepted water; and he was not abused
or threatened with abuse. It emphasized that Appellant never
asked to speak to an attorney, never refused to answer
questions, and never requested that the questioning stop. The
court acknowledged that, at some point, Appellant had retreat-
ed to a corner of the room for about fifteen to twenty minutes,
and wrote down numerous times that he loved his wife.[19]

The court found that, thereafter, Detective Bradbury con-
fronted Appellant with what he believed were lies regarding
his whereabouts at the time the crimes were committed,
placed his hand on the bible, and swore on his parents' graves

19. Appellant also wrote and later crossed out the phrase "three people
who should." At trial, he maintained that this language was inserted to
inform the detectives of three people who should be investigated as
suspects, but that Detective Bradbury directed him to cross out that
phrase in his statement. To the contrary, the trial court credited
Detective Bradbury's testimony that he never directed Appellant to
cross out any words in his statement. Trial Court Opinion, dated Feb.
10, 2016, at 29 (citing N.T., Dec. 30, 2013, at 154).

that Appellant's wife, and not Appellant, was telling the truth. Detective Bradbury did not, however, change his tone or speak in a threatening manner. The court noted that the detective then displayed pictures of Baby, at which time Appellant became emotional. Detective Bradbury ultimately called Appellant's wife at 3:45 a.m., upon Appellant's request, to let her know that he was alright. The trial court explained that, after Detective Bradbury spoke to Appellant's wife, the detective indicated that it was time for Appellant to tell the truth. Shortly thereafter, at approximately 4:00 a.m., the question and answer statement began that resulted in Appellant's confession.

The trial court found that none of the tactics employed by the detectives rose to the level of physical or psychological coercion that would render Appellant's statement involuntary. Trial Court Opinion, at 31. In support of its finding of voluntariness of Appellant's confession, the trial court further emphasized that Appellant, a highly intelligent 26 year-old with a master's degree in electrical and computer science engineering, was informed of his *Miranda* rights prior to his confession and signed the *Miranda* waiver form, reviewed and signed the written confession, and executed a consent to have his statement audio and video recorded. The trial court observed that in Appellant's videotaped confession, which took place after the lengthy period of questioning, Appellant appears calm, cooperative and exhibited no signs of physical exhaustion or injury. Based on the totality of these circumstances, the trial court concluded that Appellant's statements were voluntary and not subject to suppression.

 It is well-established that when a defendant alleges that his confession was involuntary, the inquiry becomes "not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess." *Commonwealth v. Sepulveda*, 618 Pa. 262, 55 A.3d 1108, 1137 (2012) (quoting *Commonwealth v. Templin*, 568 Pa. 306, 795 A.2d 959, 966 (2002)). The voluntariness of a confession is

determined from a review of the totality of the circumstances surrounding the confession. *Nester*, 709 A.2d at 882. The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily. *Id.*

When examining the voluntariness of a statement pursuant to the totality of the circumstances, a court should consider: the duration and means of the interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and all other factors that could drain a person's ability to resist suggestion and coercion. *Commonwealth v. Perez*, 577 Pa. 360, 845 A.2d 779, 787 (2004) (citation omitted). Additional relevant factors include: the accused's age and level of education and experience; his extent of previous experience with the police; whether the accused was advised of his constitutional rights; whether he was injured, ill, drugged, or intoxicated when he confessed; whether he was deprived of food, sleep or medical attention, and whether he was abused or threatened with abuse. *Id.* at 787.

Applying this jurisprudence to the totality of the circumstances, we find that the suppression court's findings are supported by the record and its conclusion that Appellant's confession was voluntary is correct. A review of the duration and means of the interrogation reveals that while Appellant was present at the police station for at least thirteen hours before he confessed (from approximately 3:15 p.m. to sometime after 4:00 a.m.), he was not subjected to overbearing physical or mental coercion and, instead, made a free and unconstrained decision to confess after having been advised of his rights. Detective Bradbury's suppression testimony, which the trial court credited, acknowledged that during the questioning, he confronted Appellant with what he believed were lies regarding Appellant's whereabouts at the time of the murder, N.T., Dec. 30, 2013, at 96, swore on the bible and his dead parents' graves that Appellant was lying, *id.* at 156; displayed pictures of Baby, N.T., Jan. 2, 2014, at 21–22; discussed insurance fraud in an unrelated matter and informed Appellant that it was a crime to lie to an insurance

company regarding a claim; *id.* at 29–30; and indicated to Appellant that he could have breakfast with his wife after the questioning. *Id.* at 40. We agree with the trial court that, under the totality of the circumstances of this case, these tactics did not amount to manipulative or coercive conduct that deprived Appellant of his ability to decide to confess voluntarily. *See Nester*, 709 A.2d at 884 (holding that not all psychological persuasion is prohibited).[20] We emphasize that the trial court credited expressly Detective Bradbury's testimony that he made no promises or threats to garner Appellant's confession. *See* N.T., Dec. 30, 2013, at 108.

While Appellant is not an American citizen and may have been unfamiliar with police practices, he is a highly-educated adult, holding a master's degree in electrical and computer science engineering, which would enable him to understand the clear directives given to him by the detectives regarding his rights under the law. Moreover, the trial court had the opportunity to observe Appellant's demeanor extensively during the suppression hearing to assess whether his personality is one likely to be overborne. We further note that Appellant examined each of his written statements, made corrections thereto and signed off on each statement, N.T., Dec. 30, 2013, at 89; indicated that he understood his *Miranda* rights when read to him by Detective Bradbury, and voluntarily signed the *Miranda* waiver form as well as execute a consent to video tape his confession. *Id.* at 93–94. Finally, there was nothing in Appellant's video-taped confession to suggest that he was under compulsion to confess or that he was physically or mentally compromised as Appellant appeared calm and rational, indicated that he was treated with courtesy and respect during the questioning, and stated that he had no complaints with the detectives. Accordingly, Appellant has failed to estab-

20. Further, that Appellant indicated in one his statements that he felt helpless and wished others would believe him if something happened in the future does not establish that the detectives coerced his confession. That particular statement was made after the detectives confronted Appellant with inconsistencies between his version of the events and that of his wife. Appellant's sentiment could merely reflect his realization that he may be found criminally liable for the offenses at issue.

lish that his confession was involuntary and should have been suppressed.

## VIII. Suppression Facts Unsupported by Record

Overlooking that this Court views any discrepancies in the evidence in favor of the party who prevailed at the suppression hearing, Appellant maintains that the suppression court's findings of fact were erroneous because that court ignored material facts that were favorable to the defense. He enumerates twenty-two "erroneous" factual findings, which, Appellant believes, impacted adversely the trial court's legal conclusions on the suppression issues. *See* Brief of Appellant at 23–26.[21] He argues that there was a systematic pattern in the trial court's errors because each fact that the court ignored implicated either a restraint on his freedom, perjury by the prosecution witnesses, or threats, promises, coercion and deception that occurred during his interrogation.

The Commonwealth does not respond substantively to this claim, contending instead that the issue is waived because Appellant failed to identify where in the record he raised this claim. *See* Brief for Appellee at 7 (citing Pa.R.A.P. 2119(e), which requires an appellant to identify where in the record he

21. The topics of the allegedly erroneous findings include: Detective Bradbury's subjective belief regarding whether Appellant was free to leave upon the administration of *Miranda* rights; whether detectives kept Appellant's casino player's card; whether he could drive himself to the police station; whether the casino area where he met Detective Bradbury was unsecured; whether Appellant received incoming calls on his cell phone while being questioned; whether he was precluded from calling his wife during the interview; whether the police station was locked; when the phone and car searches were completed; when the detectives discovered a contradiction regarding Appellant's whereabouts at the time of the offenses; whether Detective Bradbury stated that his wife could be arrested for making false statements to police; whether the detectives stated that Appellant could be arrested for insurance fraud; whether the detectives questioned Appellant continuously or took breaks; whether the detectives displayed Baby's photos; whether Appellant indicated he was "completely helpless" in one of his statements made prior to his confession; whether the detectives promised Appellant that he could see his wife; whether Detective Bradbury promised on his dead parents' graves that Appellant was lying; and whether Appellant sat on the floor during the interrogation to avoid questioning.

preserved an issue for appellate review). The trial court addressed the contention, finding that all of its findings of fact were supported by the record as it found Detective Bradbury's testimony to be credible and resolved discrepancies in Appellant's testimony against him. Trial Court Opinion, at 37.

Viewing Appellant's claim as merely a supplement to his suppression challenges and not a separate issue, we conclude that Appellant is not entitled to relief. In resolving the suppression issues herein, we have already addressed Appellant's various challenges to the trial court's findings of fact and conclusions of law and have concluded that the record supports all material facts found and that the legal conclusions drawn from those facts were correct.

## IX. Presentation of False Evidence

Appellant next contends that the Commonwealth engaged in prosecutorial misconduct during the suppression hearing by presenting false evidence and by withholding exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Similar to his previous claim challenging the trial court's factual findings, Appellant argues that both the false evidence and the withheld evidence implicated whether he was in legal custody when questioned by detectives and, thus, affected adversely the trial court's legal conclusions on his suppression issues. In support of this issue, in his *pro se* brief, Appellant compares the suppression testimony of Detective Bradbury to his trial testimony and/or to documentary evidence presented at trial, finds eighteen inconsistencies, and concludes summarily that such inconsistencies prove as a matter of law that the suppression hearing testimony was false and that the prosecution knowingly presented perjured testimony in violation of Appellant's due process rights.[22]

22. The topics of the alleged inconsistencies in the detectives' testimony include: Detective Bradbury's subjective belief regarding whether Appellant was free to leave upon the administration of *Miranda* rights; Appellant's requests to call his wife; the phone calls Appellant received during the interview; the surveillance of his car at the casino; whether Appellant sought to drive his own car to the police station; when his

 The Commonwealth does not respond to the substance of this claim, alleging instead that the trial court deemed it waived. A review of the record indicates that the trial court found only the *Brady* portion of the claim waived due to Appellant's failure to identify what evidence the prosecution withheld. Trial Court Opinion, at 37–38. The trial court's finding in this regard is correct. Similarly, Appellant has not identified in his appellate brief the particular evidence allegedly withheld by the prosecution. Accordingly, we deny relief on the *Brady* component of this claim based on waiver. *See Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291, 326 n.34 (2011) (deeming a *Brady* claim waived for lack of development).

 Examining the remaining allegation that the Commonwealth presented false evidence at the suppression hearing, we conclude that Appellant has failed to demonstrate entitlement to relief. Appellant cites only discrepancies in the detective's testimony and offers nothing to support his serious allegation that the prosecution knowingly presented false evidence. We decline Appellant's invitation to reweigh the suppression evidence against the trial evidence to conclude that the former was false.

 While Appellant was free to use any inconsistencies between the detective's suppression and trial testimony for impeachment purposes on cross-examination at trial, such inconsistencies, in and of themselves, do not constitute false evidence. *See Commonwealth v. Ali*, 608 Pa. 71, 10 A.3d 282, 294 (2010) (citations omitted) (holding there is no claim of purposeful prosecutorial misrepresentation where the record fails to reveal any indication of deceptive tactics on the part of

cell phone was downloaded in connection with the consensual search and where that search occurred; when the detectives found out about his wife's inconsistent statement; whether the detectives possessed Appellant's phone records and when such records were analyzed; at what time Appellant made his handwritten statements; how many photos of Baby were displayed; the name of the two white men who Appellant indicated committed the murder/kidnapping; whether there was audio or visual recordings made in Appellant's holding cell; and whether Appellant spoke to Detective Bradbury after arraignment.

the prosecution; minor discrepancies in the Commonwealth's case will not be considered false evidence).[23]

## X. Improper Jury Instruction on Voluntariness of Confession

 Appellant argues that the trial court erred by failing to charge the jury with the optional language from the suggested standard jury instruction on the voluntariness of a confession set forth at Pa. SSJI (Crim) 3.04(C). The optional language provides that the length of delay between arrest and arraignment should be considered in determining the voluntariness of the defendant's confession.[24] This time period (between arrest and arraignment) has legal relevance as this Court previously held in *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977), *overruled by Commonwealth v. Perez*, 577 Pa. 360, 845 A.2d 779 (2004), that if a defendant was not arraigned within six hours after his arrest, the statements made after his arrest were inadmissible at trial. *Davenport's* bright-line six-hour rule was adopted to guard against the coercive influence of custodial interrogation and to ensure that

**23.** Included in his argument on this issue is a separate claim of prosecutorial misconduct, alleging that the prosecutor improperly bolstered the credibility of one of its witnesses during closing argument at the suppression hearing. *See* Brief for Appellant at 21 (citing N.T., Jan. 31, 2014, at 39–40). Appellant does not elaborate on how the trial court's deliberation process was prejudiced by the challenged comment during a pretrial proceeding. In any event, we deny relief on the ground that the issue is waived because Appellant has failed to demonstrate where in the record he preserved this claim and our independent review discloses no contemporaneous objection. *See* Pa.R.A.P. 2119(e) (requiring an appellant to identify where in the record he preserved an issue for appellate review).

**24.** The relevant portion of Pa. SSJI (Crim) 3.04(C), with the omitted optional language in brackets, provides as follows:

The facts and circumstances to be considered include the age, intelligence, personality, education, experience, and mental and physical state of the defendant, how the defendant was treated before, during, and after questioning, the time, place, and conditions under which the defendant was detained and questioned, the motives and attitudes of the police who questioned [him] [her] and what was said and done by the police, the defendant, and anyone else present during the questioning. [You should consider any delay by the police in bringing the defendant before a magistrate for arraignment and whether the delay was unnecessary.]

the accused is afforded the rights to which he is entitled at his arraignment without unnecessary delay. *Davenport*, 370 A.2d at 305.[25]

This Court in *Perez* abrogated the bright-line rule of inadmissibility of statements made more than six hours after arrest in favor of a totality of the circumstances approach, but held that unnecessary delay between arrest and arraignment remains a factor to consider in the voluntariness analysis. *See id.* at 787 (explaining that "[i]f delay [between arrest and arraignment] exceeds six hours, it is not grounds to suppress, but is one factor that must be considered in determining whether, in the totality of circumstances, coercion resulted in the challenged evidence").

In denying Appellant's request to include the optional language directing the jury to consider the delay between his arrest and arraignment, the trial court found that Appellant never challenged the timeliness of his arraignment at trial, and, thus, there was no factual determination to be made by the jury in this regard. *See* N.T., Oct. 8, 2014, at 30–31. The court found that inclusion of the charge given the state of the record would merely confuse the jury. Trial Court Opinion, at 54. The trial court concluded that, when read in the context of the charge as a whole, the instruction on the voluntariness of Appellant's statements was thorough and clear. *Id.*

Appellant contends that, contrary to the trial court's finding, he presented trial evidence of unnecessary delay in arraignment. Rather than citing a particular portion of the trial record in which arraignment delay was referenced, Appellant alters course and retreats to his already rejected contention that he was arrested at 11:03 p.m. on October 25, 2012, when the detectives read him his *Miranda* warnings. *See* Part VI, *supra*. Based on this false premise, he makes the following

**25.** Pennsylvania Rule of Criminal Procedure 519(A)(1) provides that a person who has been arrested "shall be afforded a preliminary arraignment by the proper issuing authority without necessary delay." Pa. R.Crim.P. 519(A)(1). Further, Pa.R.Crim.P. 540(F) requires the issuing authority to read the criminal complaint to the defendant at his arraignment to inform him of the nature of the charges against him, his right to counsel, and his right to reasonable bail.

unsupportable assumptions: (1) that he has established a sixteen-hour delay between his arrest at 11:03 p.m. and his arraignment at 3:15 p.m. the following day; (2) that his confession occurred after his arrest and before his arraignment and resulted from the delay in arraignment; and (3) that the jury should have been directed to consider the delay in arraignment when considering the voluntariness of his confession. Appellant concludes that the trial court committed reversible error by failing to so charge the jury. *See* Brief for Appellant at 66 (citing *Commonwealth v. Coach*, 471 Pa. 389, 370 A.2d 358 (1977) (holding that where there was a nineteen-hour delay between the defendant's arrest and arraignment before a magistrate, the trial court committed reversible error in refusing the defendant's request to charge the jury that any unnecessary delay between arrest and arraignment is a factor to be considered by the jury in determining the voluntariness of the confession)).

The Commonwealth responds that there was no undue delay between Appellant's arrest and arraignment that warranted the requested jury charge. It interprets our case law as holding only that the jury instruction at issue is required in cases where an undue delay between arrest and arraignment is actually present. *See* Brief for Appellee at 24 (interpreting *Commonwealth v. Coach, supra* ). Accordingly, the Commonwealth concludes, the trial court did not abuse its discretion by refusing to charge the jury that it must consider that factor in the instant case.

 Trial courts have broad discretion in crafting jury instructions, and this Court will uphold an instruction so long as it clearly and accurately presents the law to the jury. *Commonwealth v. Simpson*, 620 Pa. 60, 66 A.3d 253, 274 (2013). Here, the trial court did not abuse its discretion by refusing to administer an optional suggested standard jury instruction untethered to facts presented at trial. Unlike the defendant in *Coach, supra,* Appellant made no post-arrest inculpatory statements that were subject to suppression based

on a delay in arraignment.[26] As we have already concluded, Appellant was arrested after he completed his video-taped confession at approximately 7:31 a.m. on October 26, 2012, and was arraigned later that day at approximately 3:15 p.m.

While several hours passed between Appellant's arrest and arraignment, his confession was made prior to his arrest and, thus, could not have been the result of any delay in bringing Appellant before a magistrate. Under these circumstances, the trial court was correct in concluding that the omitted instruction had no relevance to any factual determination to be made by the jury. Additionally, upon review, we agree with the trial court that when read in the context of the charge as a whole, the instruction on determining the voluntariness of Appellant's statements was thorough and clear. *See* N.T., Oct. 8, 2014, at 183–86. Appellant is, therefore, not entitled to relief on this claim.

## XI. Statutory Review

Finally, this Court must affirm the sentence of death unless we determine that: (i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance. 42 Pa.C.S. § 9711(h)(3)(i)–(ii). After reviewing the record below, we conclude that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor, but rather was based on the evidence presented at trial. We further conclude that the evidence supports at least one aggravating circumstance for each of the murders committed.[27]

26. We further find no evidence suggesting that any delay between Appellant's confession and his arraignment was indicative of improper pre-confession police tactics. *See Coach*, 370 A.2d at 361 (referencing that post-confession delay prior to arraignment may be relevant to the extent such delay reveals pre-confession police tactics).

27. As noted, the jury found four aggravating circumstances in relation to Baby's murder: holding the victim for ransom, 42 Pa.C.S. § 9711(d)(3); commission of the killing during the perpetration of a felony, *id.* § 9711(d)(6); conviction of another federal or state offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment was imposable, *id.* § 9711(d)(10); and

## XII. Conclusion

The judgment of sentence is affirmed, and the Prothonotary is directed to transmit the record to the Governor. *See* 42 Pa.C.S. § 9711(i).

Chief Justice Saylor and Justices Todd, Donohue, Dougherty, Wecht and Mundy join the opinion.

the victim was a child under twelve years of age. *Id.* § 9711(d)(16). The two aggravating circumstances found in relation to Grandmother's murder were: commission of the killing during the perpetration of a felony, *id.* § 9711(d)(6), and conviction of another federal or state offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment was imposable. *Id.* § 9711(d)(10). At the penalty phase, the parties did not largely dispute the existence of the aggravating factors, but rather contested the weight to be given such factors in light of the evidence of mitigation.