J-S06016-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LUIS MANUEL VELEZ-DIAZ | : | |
| | : | |
| Appellant | : | No. 279 MDA 2022 |

Appeal from the Judgment of Sentence Entered January 12, 2022
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0005167-2020

BEFORE:   STABILE, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:           **FILED: APRIL 11, 2023**

Appellant Luis Manuel Velez-Diaz appeals from the judgment of sentence imposed after he was convicted of multiple counts of driving under the influence (DUI) and related offenses. Appellant asserts that the trial court erred in denying his suppression motion and challenges the sufficiency of the evidence. After review, we reverse in part, and we affirm in part.

The trial court summarized the relevant facts and procedural history of this case as follows:

> On August 6, 2020, Trooper Elliot Wilker[1] was on Interstate 83 northbound near exit 24, Emigsville, around 1:18 am. Trooper Wilker was stationary . . . and noticed a dark color sedan severely

---

[*] Former Justice specially assigned to the Superior Court.

[1] The notes of testimony reflect that the trooper spelled his name "Wilker" and not Walker. **See** N.T. Suppression Hr'g, 3/15/21, at 7; N.T. Trial, 1/12/22, at 6. We have amended the trial court's references to Trooper Wilker accordingly.

swerve from its lane, appearing to cross over a fog line. Trooper Wilker began following the vehicle northbound and observed the vehicle swerving within its lane and a fluctuation in speed. At that point, Trooper Wilker initiated a traffic stop and the vehicle pulled over with a delayed response. Everything except the initial swerve that caught Trooper Wilker's attention was captured on the Motor Vehicle Recording [(MVR)].

Once the vehicle stopped, Trooper Wilker observed two occupants in the vehicle, and the driver was identified as [Appellant]. Trooper Wilker noticed the odor of marijuana emanating from the vehicle, a faint odor of alcoholic beverage, and a strong odor of perfume or cologne. [Appellant's] eyes were bloodshot and glassy. [Appellant] admitted to smoking marijuana "a couple of hours ago." [Appellant] also admitted to not possessing a driver's license.

Trooper Wilker then had [Appellant] step out of the vehicle and perform a field sobriety test. First, the walk-and-turn test was administered. Trooper Wilker indicated that six out of eight possible clues of impairment were observed. Then, the one-legged stand test was administered where [Appellant] exhibited two out of four clues of impairment. Finally, the Romberg balancing test was administered. During the Romberg balancing test, [Appellant] was observed exhibiting rapid eyelid tremor, body tremors, as well as hand and leg tremors. After consideration of [Appellant's] performance during the field sobriety test, Trooper Wilker asked [Appellant] to submit to a blood test.

Initially, Trooper Wilker began to transport [Appellant] to booking after placing him under arrest. On the way, Trooper Wilker could smell the odor of marijuana and asked [Appellant] if he had marijuana on him. [Appellant] admitted to having marijuana in his underwear while in the patrol vehicle. When Trooper Wilker and [Appellant] arrived at booking, no phlebotomist was available to effectuate a blood draw. Then, [Appellant] was taken to York Hospital where a phlebotomist drew [Appellant's] blood at approximately 2:11 a.m. The blood was packaged and sent to NMS Labs. The toxicology report indicated positive findings for Methamphetamine, 11-Hydroxy Delta-9 THC, Delta-9 Carboxy THC, and Delta-9 THC.

Trial Ct. Op., 3/22/22, at 2-3 (unpaginated) (some formatting altered).

Prior to trial, Appellant filed a motion to suppress claiming that the traffic stop was illegal. Mot. to Suppress, 1/20/21. Following a hearing on March 15, 2021, the trial court denied Appellant's motion. Trial Ct. Order, 3/15/21, at 6.

Following a non-jury trial held on January 12, 2022, the trial court found Appellant guilty of four counts of DUI and one count of driving on roadways laned for traffic.[2] At sentencing that same day, the trial court concluded that Appellant's DUI convictions merged for sentencing purposes and imposed a sentence of three days to six months of incarceration, with credit for three days of time served and a $1,000.00 fine for DUI under Section 3802(d)(1)(i). The trial court also ordered Appellant to pay a $25.00 fine for the charge of driving on roadways laned for traffic. Sentencing Order, 1/12/22.

Appellant filed a timely appeal on February 10, 2022. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant raises two issues, which we have reordered as follows:

1. Whether the evidence was insufficient to convict [Appellant] of 75 Pa.C.S. § 3309(1) where there was no evidence that his driving constituted a safety hazard?

2. Whether the trial court erred in denying [Appellant's] motion to suppress the traffic stop on the basis of a lack of reasonable suspicion to stop the vehicle?

---

[2] 75 Pa.C.S. §§ 3802(d)(1)(i), 3802(d)(1)(ii), 3802(d)(1)(iii), 3802(d)(2), and 3309(1), respectively.

Appellant's Brief at 5.

## Sufficiency

Appellant argues that the evidence was insufficient to sustain his conviction for driving roadways laned for traffic under 75 Pa.C.S § 3309(1).[3] Appellant's Brief at 15. In support, Appellant argues that the Commonwealth failed to establish that he created a safety hazard. *Id.*

When reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all [of] the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every

---

[3] Because Appellant challenges both the sufficiency of the evidence and the ruling of the suppression court, we address the sufficiency of the evidence first. *See Commonwealth v. Spence*, ___A.3d___, 2023 PA Super 22, 2023 WL 2002292, at *4 n.4 (Pa. Super. filed Feb. 15, 2023) (stating that because "a successful sufficiency of the evidence claim warrants discharge on the pertinent crime, we shall address this issue first" (citing *Commonwealth v. Toritto*, 67 A.3d 29, 33 (Pa. Super. 2013) (*en banc*)). Moreover, we address the sufficiency of the evidence without a diminished record. *See Commonwealth v. Gray*, 867 A.2d 560, 567 (Pa. Super. 2005) (explaining that "[i]n evaluating the sufficiency of the evidence, we do not review a diminished record [and] the law is clear that we are required to consider all evidence that was actually received, without consideration as to the admissibility of that evidence or whether the trial court's evidentiary rulings are correct" (citations omitted)). "Where improperly admitted evidence has been allowed to be considered by the [finder of fact], its subsequent deletion does not justify a finding of insufficient evidence. The remedy in such a case is the grant of a new trial." *Commonwealth v. Stanford*, 863 A.2d 428, 432 (Pa. 2004) (citation omitted).

possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Gause*, 164 A.3d 532, 540-41 (Pa. Super. 2017) (*en banc*) (citation omitted and some formatting altered).

Section 3309(1) states as follows:

**(1) Driving within single lane.**—A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver **has first ascertained that the movement can be made with safety.**

75 Pa.C.S. § 3309(1) (emphasis added).

This Court has explained that although Section 3309(1) requires motorists to maintain a single lane of travel "as nearly as practicable," the statute "does not foreclose minor deviations." *Commonwealth v. Enick*, 70 A.3d 843, 847 (Pa. Super. 2013). Further, Section 3309(1) is intended to prevent motorists from changing lanes in a manner that creates a safety hazard. *See, e.g.*, *Commonwealth v. Feczko*, 10 A.3d 1285, 1292 (Pa. Super. 2010) (*en banc*).

There are virtually no decisions by this Court that address the sufficiency of the evidence necessary to prove the safety element of Section 3309(1) beyond a reasonable doubt. However, this Court has routinely addressed the

safety element in cases involving probable cause, which is a lower quantum of proof than beyond a reasonable doubt. "Whether an officer possesses probable cause to stop a vehicle for a violation of [Section 3309(1)] depends largely upon on whether a driver's movement from his lane is done safely." *Commonwealth v. Cook*, 865 A.2d 869, 874 (Pa. Super. 2004) (citation omitted). As previously stated, although Section 3309(1) requires motorists to maintain a single lane of travel "as nearly as practicable," it "does not foreclose minor deviations." *Enick*, 70 A.3d at 847. Indeed, even in cases that analyze the safety element under the lesser standard of probable cause, Pennsylvania Courts have held that the Commonwealth must establish that the vehicle departed from its lane of travel and that the driver did not first determine if he could do so safely. *See Commonwealth v. Gleason*, 785 A.2d 983 (Pa. 2001); *Commonwealth v. Garcia*, 859 A.2d 820 (Pa. Super. 2004).

In *Gleason*, the defendant was stopped for violating Section 3309(1) after he momentarily crossed "the berm line by six to eight inches on two occasions for a period of a second or two over a distance of approximately one quarter of a mile." *Gleason*, 785 A.2d at 983. At trial, the police officer did not testify that there were other vehicles on the road or that the defendant moved from his lane without first determining if he could do so safely. *Id.* at 985. On appeal, the *Gleason* Court concluded that the Commonwealth had failed to demonstrate that the officer had probable cause to believe that the defendant had violated Section 3309(1) because the record did not establish

that the defendant "created a safety hazard." *Id.* at 989. Similarly, in *Garcia*, this Court held that "where a vehicle is driven outside the lane of traffic for just a momentary period of time and in a minor manner, a traffic stop is unwarranted[,]" and "probable cause is lacking." *Garcia*, 859 A.2d at 823.

By comparison, in *Enick*, the Commonwealth presented evidence the driver crossed the double yellow center line into oncoming traffic as a police officer was driving in the oncoming lane. *See Enick*, 70 A.3d at 846, 848. On appeal, the *Enick* Court concluded that because the driver crossed the center line into oncoming traffic, the arresting officer had probable cause to conduct a stop for a violation of Section 3309(1). *Id.* at 848.

Here, at trial, the Commonwealth presented testimony from Trooper Wilker and the motor vehicle recording (MVR) which depicted Appellant weaving within his lane and making contact with the center line. Trooper Wilker also testified that before the MVR was activated, he witnessed Appellant cross the fog line in a "severe" manner. N.T. Trial, 1/12/22, at 8-11.

In its Rule 1925(a) opinion, the trial court credited Trooper Wilker's testimony and explained:

> [The trial court] observed [Appellant's] vehicle swerving within its lane and crossing lane designators on the MVR. Trooper Wilker could be heard in the MVR narrating what he was witnessing when following [Appellant's] vehicle. Trooper Wilker also credibly testified to witnessing lane deviations that were not captured on the MVR and that his attention was drawn to the vehicle due to an initial cross while he was finishing up a previous traffic stop.
>
> [Appellant], beyond a reasonable doubt, failed to drive his vehicle as nearly as practicable entirely within a single lane without first having ascertained that the movement could be made with safety.

Trial Ct. Op. at 8-9 (unpaginated).

However, our review of the record confirms that there was no testimony or evidence concerning whether Appellant crossed the center line or fog line without first ascertaining that the movement could be made safely. *See* 75 Pa.C.S. § 3309(1).

Indeed, Trooper Wilker testified on direct examination as follows:

Q. So you mentioned that you had finished a [separate] traffic stop. After you disengaged from that traffic stop, did another vehicle on Interstate 83 catch your attention?

A. Yes. It was a dark in color sedan. It was a couple hundred yards ahead of my traffic stop. But I saw a severe swerve or movement from the lane, which from my vantage point the vehicle crossed over the fog line, so I was -- I wanted to investigate that. So I began following that vehicle northbound. I crawled up to it from my position and then began following it northbound.

Q. When you continued to follow that vehicle then, did you see any additional things that raised your concern?

A. Yes. I believe the vehicle was weaving within its lane. I believe its speed was fluctuating.

Q. At some point did you then make a decision to conduct a traffic stop?

A. Yes.

N.T. Trial, 1/12/22, at 8-9.

Additionally, the record reflects that Appellant was on a divided interstate highway and could not have entered an oncoming lane of travel.[4]

_____

[4] *Cf. Commonwealth v. Best*, 120 A.3d 329, 344 (Pa. Super. 2015) (holding that the testimony of two witnesses, as well as the investigating state trooper's testimony that the defendant admitted entering the opposite lane of
*(Footnote Continued Next Page)*

Further, the record contains no evidence that any other cars were driving in Appellant's vicinity at the time of the stop. Although Trooper Wilker testified that he saw Appellant travel outside his lane in a severe manner prior to the activation of the MVR, and while the MVR and testimony reflected that Appellant swerved within his lane, Trooper Wilker never mentioned or addressed whether Appellant executed this maneuver without first determining if it could be done safely.

Under these circumstances, we conclude that although the evidence revealed a brief infraction or infractions, there was no evidence that Appellant's vehicle moved in an unsafe manner or that Appellant created a safety hazard. Accordingly, we conclude that the evidence is insufficient to prove that Appellant violated Section 3309(1).[5] Therefore, we are constrained

---

travel and causing a head-on accident, was sufficient to support a conviction under 75 Pa.C.S. § 3309(1)).

[5] We are cognizant that the **Gleason** Court was not reviewing a challenge to the sufficiency of the evidence necessary to sustain a conviction for violating 75 Pa.C.S. § 3309(1). Rather, it was determining whether this Court erred in reversing the trial court's order granting the defendant's suppression motion pursuant to **Commonwealth v. Whitmyer**, 668 A.2d 1113 (Pa. 1995). Under **Whitmyer**, and a former version of 75 Pa.C.S. § 6308(b), law enforcement were required to have "articulable and reasonable grounds to suspect a violation of [the Motor Vehicle Code]" to effectuate a vehicle stop[,] and "articulable and reasonable grounds" was held to be the equivalent of "probable cause," requiring police have probable cause to believe the vehicle or its driver was in violation of the Vehicle Code. **Gleason**, 785 A.2d at 986; **Whitmyer**, 668 A.2d at 1116-17. The **Gleason** Court held that, under the facts of that case, the officers lacked probable cause to stop the vehicle. **Gleason**, 785 A.2d at 989. However, we note that the **Whitmyer** and **Gleason** line of cases applying former Section 6308(b) were superseded by
*(Footnote Continued Next Page)*

to reverse the judgment of sentence on this count and discharge Appellant on the conviction for violating 75 Pa.C.S. § 3309(1).[6]

### Suppression

Next, Appellant contends that the trial court erred when it denied Appellant's motion to suppress. Appellant's Brief at 11. Appellant argues that Trooper Wilker did not have reasonable suspicion to conduct a traffic stop, and therefore, the traffic stop was unlawful. *See id.* at 12-14.

We review Appellant's challenge to the denial of his suppression motion bearing in mind the following principles:

> [O]ur standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions

_____

statute as stated in *Commonwealth v. Holmes*, 14 A.3d 89 (Pa. 2011). In *Holmes*, our Supreme Court held that the "quantum of cause a police officer must possess in order to conduct a vehicle stop based on a possible violation of the Motor Vehicle Code" is "reasonable suspicion," and in order to establish reasonable suspicion, the "officer must be able to point to **specific and articulable facts** which led him to reasonably suspect a violation of the Motor Vehicle Code[.]" *Holmes*, 14 A.3d at 94, 96 (emphasis in original). We reiterate that we are referencing *Gleason* only with respect to its recognition of the "safety" element of Section 3309(1). Moreover, the quantum of evidence necessary to justify a traffic stop will be addressed below in our discussion of Appellant's challenge to the suppression court's ruling.

[6] As noted above, Appellant challenged the sufficiency of the evidence with respect to 75 Pa.C.S. § 3309(1). Accordingly, although we reverse Appellant's conviction for 75 Pa.C.S. § 3309(1), we affirm the judgment of sentence in all other respects. *See, e.g.*, *Spence*, 2023 WL 2002292, at *4 n.4 (explaining that a successful challenge to the sufficiency of the evidence "warrants discharge on the **pertinent crime**" (citation omitted and emphasis added)).

of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

***Commonwealth v. Yandamuri***, 159 A.3d 503, 516 (Pa. 2017) (citations omitted).

Additionally,

[w]hen a police officer initiates a traffic stop of a vehicle, the stop constitutes a "seizure" within the meaning of the Fourth Amendment and activates constitutional protections against unreasonable seizures and detentions. ***Whren v. United States***, 517 U.S. 806, 809-10 (1996). Generally, a traffic stop must be supported by sufficient facts to provide an officer with reasonable suspicion to believe that the vehicle or driver was in violation of a provision of the Vehicle Code. ***See*** 75 Pa.C.S. § 6308(b). However, a stop based on reasonable suspicion under § 6308(b) must "serve an investigatory purpose relevant to the suspected violation." ***Commonwealth v. Feczko***, 10 A.3d 1285, 1291 (Pa. Super. 2010) (*en banc*); ***Commonwealth v. Salter***, 121 A.3d 987, 992 (Pa. Super. 2015). Therefore, in circumstances where the violation is such that it requires no additional investigation, the officer must possess probable cause before initiating the traffic stop. ***Feczko***, 10 A.3d at 1291.

***Commonwealth v. Ruffin***, 282 A.3d 796, 800 (Pa. Super. 2022) (some formatting altered), *appeal denied*, ___ A.3d ___, 251 EAL 2022, 2023 WL 141925 (Pa. filed Jan. 10, 2023). In determining what level of legal justification is necessary to support a vehicle stop, this Court has explained:

[W]hen considering whether reasonable suspicion or probable cause is required constitutionally to make a vehicle stop, the nature of the violation has to be considered. If it is not necessary to stop the vehicle to establish that a violation of the Vehicle Code has occurred, an officer must possess probable cause to stop the

vehicle. Where a violation is suspected, but a stop is necessary to further investigate whether a violation has occurred, an officer need only possess reasonable suspicion to make the stop. Illustrative of these two standards are stops for speeding and DUI. If a vehicle is stopped for speeding, the officer must possess probable cause to stop the vehicle. This is so because when a vehicle is stopped, nothing more can be determined as to the speed of the vehicle when it was observed while traveling upon a highway. On the other hand, if an officer possesses sufficient knowledge based upon behavior suggestive of DUI, the officer may stop the vehicle upon reasonable suspicion of a Vehicle Code violation, since a stop would provide the officer the needed opportunity to investigate further if the driver was operating under the influence of alcohol or a controlled substance.

*Salter*, 121 A.3d at 993 (citations omitted). This Court has held that reasonable suspicion of DUI is established when a police officer observes a vehicle weaving within its lane of travel and drifting over the fog line, and this reasonable suspicion of DUI is sufficient to support a lawful traffic stop. *See Commonwealth v. Walls*, 206 A.3d 537, 543 (Pa. Super. 2019).

During direct examination at the suppression hearing, Trooper Wilker testified, in relevant part, as follows:

Q. So let's go to this case. On August 6th of 2020, tell me about what caught your attention.

A. What caught my attention was a dark blue Mercedes Benz sedan which drifted to the right side of the lane crossing the lane designator.

Q. When you say lane designator, what do you mean?

A. In this case it was a dashed lane designator. It was an entrance ramp lane and then so -- first, it was northbound on [Interstate] 83. There's two northbound lanes, left and right lane. Then there was a far right lane which was an entrance ramp which had dash laned designators.

Q. Do you remember how far behind this vehicle you were traveling when that happened?

A. When I originally saw the vehicle make that first cross, I was maybe 1 to 200 yards behind, in that ballpark.

Q. Okay. And we'll watch the video here or we'll at least attempt to do so in a few minutes, but when you say it crossed that line, can you be more specific, if you were able to observe more specifically what portion of the car crossed over that line?

A. That initial cross, it was about half of a car, so the dash line would have been roughly in the middle of the car between the two tires.

Q. Okay. So you observed that. Then you're following behind the car. What else do you see?

A. As I continued following behind the car, I observed it to be weaving within its lane from the left side to the right side. Continued doing that, and then there was another slight cross on the center lane designator. Again, the vehicle is in the right lane at this time, so it crossed over the center lane designator. This was not as far across, but half the tire -- the whole tire crossed.

Q. On that section of 83, what's the roadway surface like? Is it good? Are there potholes every now and then?

A. There can be potholes every now and then. Nothing egregious that sticks out in my mind.

Q. As you're following this car, are you in a state patrol police vehicle?

A. Yeah, a marked State Police vehicle.

Q. And was this vehicle traveling in the left lane or the right lane?

A. It was traveling in the right lane.

Q. And were you traveling in the right lane as well?

A. Yes, behind it.

Q. So eventually, you put on your lights and siren and pull the vehicle over; right?

A. That's correct.

Q. Why did you do that? What were you thinking was going on?

A. Based on the driving, I suspected DUI.

Q. Okay. There's a dash cam in this case. Have you viewed it recently? By recently, I mean within the last couple of days.

A. Yes.

Q. I'm going to show you a portion of it, and then once we're done viewing it, you can tell me if that is the dash cam from this case.

A. Okay.

\*  \*  \*

Q. What did we see on the right side of that video?

A. In the beginning of the video, I was on a previous traffic stop. That is what you're seeing there. I pulled out and turned off my lights and continued northbound. There's a slight crest in the hill. As I'm coming up over that hill is when I initially saw the first cross, which we already talked about. The video's, obviously, not clear, and when you're looking through a windshield and not through a dash cam, it' s a bit easier to see.

So that's what we saw so far, and then if you're watching, the vehicle is starting to drift over to the left side. It's moving at a strange rate of speed. If you watch the vehicle, within the lanes, it goes back and forth. At this time it's closer to the right fog line.

Q. I'm going to hit play again. When you see the behaviors that you noted when this actually happened, just let us know; okay?

A. Okay.

Q. I'm playing the video.

(Whereupon, the video was played.)

THE WITNESS: It's moving there to the right side, as you can see, and coming back to the left. Going back to the right and to the left. Back to the right. Comes back to the middle. Going towards the left there. Back towards the left. Left. There's a cross of the center lane. Back to the middle of the lane. To the left again. Over to the right. Back to the center.

N.T. Suppression Hr'g, 3/15/21, at 8-12.

Upon review, the record reflects that Trooper Wilker observed Appellant's vehicle cross the marked traffic lines and repeatedly weave within its lane of travel, and, on this basis, Trooper Wilker suspected that Appellant was driving while impaired. **See *id.*** at 10, 12. As noted previously, this Court has held that such observations are sufficient to form reasonable suspicion of DUI, which permits a lawful traffic stop for further investigation. **See *Walls***, 206 A.3d at 543; ***Salter***, 121 A.3d at 993. In light of our scope and standard of review, we conclude that the traffic stop was legal and affirm the trial court's order denying Appellant's suppression motion. **See *Yandamuri***, 159 A.3d at 516.

### Conclusion

For the reasons set forth above, we conclude that the evidence was insufficient to establish that Appellant violated 75 Pa.C.S. § 3309(1) beyond a reasonable doubt. Additionally, we conclude that Trooper Wilker possessed reasonable suspicion to conduct a lawful traffic stop and affirm with respect to the order denying suppression. Accordingly, we reverse the judgment of sentence for the conviction under Section 3309(1) and discharge Appellant on that count only, and we affirm the judgment of sentence in all other respects.

Judgment of sentence reversed in part and affirmed in part. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/11/2023