J-S25024-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DEVON MARCELIUS GRIGGER-CROSS | : | |
| | : | |
| | : | No. 1652 EDA 2023 |
| Appellant | | |

Appeal from the Judgment of Sentence Entered May 24, 2023
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0001997-2022

BEFORE:  DUBOW, J., McLAUGHLIN, J., and BECK, J.

MEMORANDUM BY McLAUGHLIN, J.:                **FILED OCTOBER 16, 2024**

Devon Marcelius Grigger-Cross appeals from the judgment of sentence entered following his convictions for firearms not to be carried without a license, persons not to possess firearms, possession of firearm with altered manufacturing number, and two counts each of possession of a controlled substance with intent to deliver and possession of a controlled substance.[1] He challenges the denial of his motion to suppress. We affirm.

In March 2022, following a vehicle stop, Grigger-Cross was charged with multiple firearm and drug offenses. He filed a motion to suppress.

At a hearing on the motion to suppress, Grigger-Cross argued, among other things, that a frisk police conducted went beyond a permissible ***Terry***

---

[1] 18 Pa.C.S.A. §§ 6106(a)(1), 6105(a)(1), and 6110.2(a) and 35 P.S. § 780-113(a)(30) and (a)(16), respectively.

frisk and constituted a search of his person without probable cause. He also contended that the search of a backpack constituted a "warrantless search of what was in the car. It was not an inventory to search." N.T., Jan. 25, 2023, at 4-5. Following the hearing, the court made the following factual findings:

1. The arresting officer who testified, Trooper Giovanni DiSalvatore, was a six-year veteran of the Pennsylvania State Police who had previously been a correctional officer. He had had 100 hours of training in drug investigations, and over 200 arrests involving illegal drugs and/or firearms, which he knew from his experience often accompanied each other. He was well familiar with identifying these items, including identifying marijuana by smell, and with the packaging of cocaine and marijuana in particular for resale.

2. The trooper, of course, was intimately familiar with firearms. He carried one on or off duty.

3. Trooper DiSalvatore's normal detail was working out of the Philadelphia barracks patrolling highways including I-76, I-95, 309, and 422 for traffic violations but also helping to interdict chains of supply of illegal drugs, firearms, human trafficking, and money-laundering. Interstate 76, the Schuylkill Expressway, was a corridor for such activity, especially westbound leaving Philadelphia, a source city for such trade.

4. We found Trooper DiSalvatore to be a credible witness. We particularly apply this finding to his testimony about encountering and arresting [Grigger-Cross], much of which the trooper narrated as we watched video of the events recorded by a camera mounted in his police vehicle. (The audio portion of the recording was not available.)

5. Just after midnight on the night in question, the trooper was on patrol westbound on I-76 in Lower Merion Township, Montgomery County, which adjoins Philadelphia. His partner was driving their marked patrol vehicle, with Trooper DiSalvatore in the front passenger's seat.

6. They came behind a car soon determined to be driven by [Grigger-Cross], a red Chevy Cruz, going sixty-two miles

per hour in a fifty-five-mile-per-hour zone. They clocked the car for three tenths of a mile, using their vehicle's speedometer, which was calibrated for accuracy on a yearly basis.

7. They called in the car's license plate, and word came back registration was not correct for that vehicle. The Commonwealth illustrated what this meant by introducing as an exhibit a certification from the Pennsylvania Department of Transportation, Bureau of Motor Vehicles, on the plate, which was registered to [Grigger-Cross's] brother, who was also riding in the car that night, stating, "The license plate that you requested information for [that the Chevy Cruz displayed] cannot be used on any motor vehicle. This type of record is referred to as a 'tag only' record. Pa. Dep't Transp. Vehicle R. Abstract 1, Jan. 24, 2023 (Tag Only Record) (boldface and capitalization omitted).

8. The troopers initiated a stop of the Cruz by activating their overhead flashing lights. Automatically, as we saw from the footage played at the hearing, the police vehicle's camera started recording retroactively forty-five seconds before the lights went on.

9. The Cruz took about twenty seconds to move from the left lane in which it was traveling and cross the right lane to come to rest on the shoulder of the highway. By the time the car came to a full stop, the shoulder had narrowed to the point that there was practically no space between where the car had parked and the white fog line of the highway, which was being traversed by fast-moving traffic.

10. While the Cruz was maneuvering to stop, Trooper DiSalvatore saw the car's occupants making furtive movements left and right and dipping down from view. He was worried they might be hiding something that could harm him—a gun or a knife. But he couldn't see what they were doing.

11. From the troopers' car positioned behind the Cruz, Trooper DiSalvatore alighted and approached its passenger's side, as he commonly did for such stops, both for general safety reasons and because of lack of room to go on the driver's side without being in the lane of travel. He observed [Grigger-Cross] in the driver's seat, another man (who turned out to be [Grigger-Cross's] brother) in the

front passenger's seat, and a small child asleep across the backseat; none of the occupants was wearing seatbelts or restraints.

12. [Grigger-Cross's] window was down, and the trooper detected the smell of raw marijuana coming from the car. The trooper (from his passenger's-side vantage point) asked the driver (Grigger-Cross) for his license, et cetera, and he produced only a Pennsylvania identification [card], which indicated to the trooper that Grigger-Cross did not have a valid driver's license.

13. As Grigger-Cross looked for other documentation in the glove box, the trooper spotted an empty gun holster, which he knew, by itself, was not illegal to possess. Besides the trooper's testimony, the Commonwealth produced no other evidence of this holster, as it was neither seized nor photographed—unlike the gun the trooper would soon find on [Grigger-Cross's] person.

14. The trooper asked the men if there was a gun in the car. They tensed up, looked at each other, and got extremely nervous. Each said no, and did so again when asked again, but their responses were weak and uncertain. The men's behavior and responses indicated criminal activity to the trooper and increased his suspicion; he believed they were being deceptive.

15. The trooper asked [Grigger-Cross] to step out of the car. He exited the driver's side, where the trooper's partner was now standing, and came to the back of the vehicle. The trooper saw a bulge in [Grigger-Cross's] waistband where, the trooper said, people normally keep firearms. **Cf. Hicks**, 652 Pa. at 375 & n.11, 208 A.3d at 929 & n.11 (addressing evidence defendant had a firearm concealed in his waistband and/or a holster).

16. The trooper frisked [Grigger-Cross] for purposes of safety, considering, among other things, the bulge, the furtive behavior he had witnessed, and the marijuana. (The trooper had already testified to his experience with the well-known linkage between possession of illicit drugs for sale and possession of guns. **Cf.** Controlled Substances Forfeiture Act, 42 Pa.C.S. § 5802(7) ("Firearms as are found in close proximity to illegally possessed controlled substances shall be rebuttably presumed to be used or

intended for use to facilitate a violation of The Controlled Substance, Drug, Device and Cosmetic Act.").)

17. The trooper lifted up [Grigger-Cross's] sweatshirt and went straight to the bulge,[2] which the trooper believed, owing to its hardness and shape and his familiarity with guns, to be a firearm. Confirming his suspicions, he retrieved from [Grigger-Cross's] waistband what proved to be a semiautomatic pistol loaded with fourteen bullets, and alerted his partner to the firearm's presence.

18. The trooper asked [Grigger-Cross] if he had a license to carry the firearm; he said no. The trooper secured the gun and handcuffed [Grigger-Cross].

19. Further investigation would reveal to the trooper that [Grigger-Cross's] driver's license was suspended, he had no permit to carry a firearm, he was a (former) felon not legally able to possess one, and the gun had an altered serial number. The Commonwealth introduced photographs of the weapon, including its serial number, as exhibits at the hearing.

20. Meanwhile the trooper had determined that the encounter had progressed from detaining [Grigger-Cross] to arresting him. A further search of his person found cocaine, oxycodone, and over $ 3,100 in cash.

21. The troopers detained the front-seat passenger, and found on his person marijuana and oxycodone pills in a bottle without a label. The team arrested the passenger too.

21. Trooper DiSalvatore now knew that a guardian would have to be located for the child in the backseat of the Cruz, all three occupants would have to be transported to the barracks, and, lacking a driver, the car would have to be towed off the interstate and impounded. Before that could happen, he had to inventory the car's contents.

22. The trooper indicated the purpose of such a search was to safeguard any valuables against claims of defalcation (the [c]ourt's term, not the trooper's). The trooper performed

---

[2] The recording of the dash camera corroborates that the trooper lifted the sweatshirt.

the inventorial search, which turned up no valuables in the traditional sense, but in the backseat a backpack containing marijuana, cocaine, packaging materials, and a scale.

Trial Court Opinion, Feb. 3, 2023, at 5-9.

The case proceeded to a stipulated bench trial and the trial court found Grigger-Cross guilty of the above-referenced offenses. The court sentenced him to six to 12 years' imprisonment. Grigger-Cross filed a timely notice of appeal.

Grigger-Cross raises the following issues on appeal:

I. Did the lower court err in denying [Grigger-Cross's] motion to suppress on the ground that the evidence demonstrated that the arresting officer's search of [Grigger-Cross] exceeded the permissible scope of a **Terry** stop in that the officer did not initially employ a frisk of [Grigger-Cross's] outer clothing, but rather, immediately lifted up [Grigger-Cross's] sweatshirt and then recovered a firearm from his waistband?

II. Did the lower court err in denying [Grigger-Cross's] motion to suppress on the ground that the warrantless search of [Grigger-Cross's] vehicle, including the search of a backpack located in the back seat, was not a valid inventory search?

Grigger-Cross's Br. at 3 (suggested answer omitted).

In both issues raised on appeal, Grigger-Cross challenges the denial of his suppression motion. When reviewing an order denying a motion to suppress, "we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted." **Commonwealth v. Yandamuri**, 159 A.3d 503, 516 (Pa. 2017). "Our scope of review of suppression rulings includes only the suppression hearing record[.]" **Id.** We are bound by the suppression court's factual findings that

are supported by the record. *Id.* Where there is a question of law, our standard of review is *de novo*. ***See Commonwealth v. McMahon***, 280 A.3d 1069, 1071 (Pa.Super. 2022).

Grigger-Cross first argues that the officers exceeded the permissible scope of a ***Terry*** frisk. He argues the officers "did not perform [a] mere pat down of [his] outer clothing. Rather, the officer immediately lifted [Grigger-Cross's] sweatshirt and then seized a firearm from his waistband." Grigger-Cross's Br. at 9. He argues that a ***Terry*** frisk must be confined to a suspect's outer clothing and that if it goes beyond what is necessary to determine if the suspect is armed, it is not a valid search. He maintains the officer did not attempt a cursory pat down of the outer clothing to ascertain the nature of the bulge before lifting up the sweatshirt and reaching into the waistband.

In ***Terry v. Ohio***, the United States Supreme Court held that "it is reasonable under the Fourth Amendment for [a] brief stop to also include a frisk of the suspect's outer clothing where the police officer has reason to believe the suspect is 'armed and dangerous.'" ***Interest of T.W.***, 261 A.3d 409, 417 (Pa. 2021) (quoting ***Terry v. Ohio***, 392 U.S. 1, 30 (1968)). "The purpose of the frisk . . . is to dispel a reasonable fear that the stopped suspect possesses a weapon which could be used to harm a police officer or the public during the stop." *Id.* Courts apply an objective standard to determine "whether there is reasonable suspicion that a suspect is armed[.]" *Id.* To conduct a ***Terry*** frisk, "police officers 'need not be absolutely certain that the individual is armed' but rather the appropriate standard is 'whether a

reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" ***Id.*** (citation omitted). "If a police officer conducting a lawful ***Terry*** frisk detects an object within a suspect's clothing, . . . a police officer may remove an object from within a suspect's clothing under the reasonable suspicion that the object is a weapon" or "if, by touch, it is immediately apparent that the object is illegal contraband." ***Id.*** at 422.

Officer DiSalvatore testified that when Grigger-Cross exited the vehicle, the officer already suspected he was carrying a firearm and when he conducted the ***Terry*** frisk, "[he] went right to the waistband of that bulge [he] observed, and that's when [he] could feel that there was a gun in the waistband." N.T. at 26-27. He stated that he "swiped [his] hand across [Grigger-Cross's] waistband area" and "immediately felt a hard object that was in the same shape a gun is." ***Id.*** at 28. On cross-examination, the officer testified he did not swipe the sweatshirt before lifting it:

> Q. Again, here he comes to the back of the car. And you would agree with me that you are lifting up his sweatshirt right now, right?
>
> A. Correct.
>
> Q. And that you're reaching down with the front of your hand right into his pants?
>
> A. I didn't reach immediately down.
>
> Q. No?
>
> A. And you could see me swipe across. I pull up his sweatshirt and swipe across his waistband.

- 8 -

Q. Okay. But the first thing you do is pull up his sweatshirt?

A. Right.

Q. Okay. You don't swipe his sweatshirt?

Q. I didn't swipe his sweatshirt, no.

*Id.* at 59-60.

Here, the trial court concluded it was permissible under **Terry** for the officer to go straight to the concerning bulge he observed when, based on his experience, he believed it to be a firearm:

> Trooper DiSalvatore commenced the protective **Terry** search of [Grigger-Cross's] person by, understandably, going straight to the concerning bulge in [Grigger-Cross's] clothing at the waist area. The trooper felt and saw what he immediately knew, drawing on his years of experience and day-to-day familiarity with the genre, to be a firearm, and relieved [Grigger-Cross] of its possession. This action was permissible under **Terry**[.] . . .
>
> Upon seeing the bulge under [Grigger-Cross's] clothing as he exited the car the trooper had pulled to the side of the road, in light of the trooper's experience and the other suspicious behavior he had just witnessed, the trooper violated no constitutional boundaries in subjecting [Grigger-Cross] to a **Terry** frisk for weapons. When the frisk confirmed that the object in [Grigger-Cross's] waistband was a gun, which [Grigger-Cross] admitted in response to the trooper's questioning he was not permitted to carry, especially after [Grigger-Cross's] diffident but repeated denials while still in the car that there was a gun in the vehicle at all, the trooper's reasonable suspicions justifying the **Terry** frisk ripened into probable cause for arrest.
>
> At that point the trooper could continue his search of [Grigger-Cross's] person, under another well-recognized exception to the Fourth Amendment's requirement of a warrant, the search incident to lawful arrest.

Trial Ct. Op. at 27-28.

The record supports the trial court's factual findings and it did not abuse its discretion in denying the suppression motion. Based on the facts of this case, including the firearm-like bulge observed by the officers, Trooper DiSalvatore did not exceed a **Terry** stop when he went to the bulge he observed and swiped his hand under Grigger-Cross's sweatshirt.

Unlike the cases relied on by Grigger-Cross, here the firearm was immediately known by Trooper DiSalvatore to be a firearm – an object that was immediately apparent as contraband. No further investigation or manipulation of the object was required to determine its status as contraband. *Cf. Commonwealth v. Spears*, 743 A.2d 512, 516 (Pa.Super. 1999) (finding evidence should have been suppressed where record made it clear contents of pocket were not immediately apparent such that officer had to manipulate object to determine identity); *Commonwealth v. Lateef*, 667 A.2d 1158, 1162 (Pa.Super. 1995) (finding search exceeded scope of a *Terry* frisk where officer could not recall what he thought he felt in the pocket or why he removed the item from appellant's pocket and finding it exceeded the boundaries of a permissible pat down absent testimony that the officer felt a weapon or contraband in appellant's pockets); *Commonwealth v. Stackfield*, 651 A.2d 558, 562 (Pa.Super. 1994) (finding record did not support conclusion that officer felt an item he immediately recognized as contraband where a zip-lock baggie is not *per se* contraband and the record did not support that the officer recognized a "contour or mass" that made the contraband's identity immediately apparent); *In Int. of S.D.*, 633 A.2d 172,

176-77 (Pa.Super. 1993) (finding no evidence supported officer's intrusion into appellant's pocket where there was no evidence that the officer felt a weapon or contraband before reaching in the pocket); **Commonwealth v. Canning**, 587 A.2d 330, 331-32 (Pa.Super. 1991) (holding search not justified under **Terry** where officer did not articulate specific facts to justify belief appellant might be armed or and did not confine search to items that may reasonably appear to be weapons).

In his second issue, Grigger-Cross argues that the officers improperly conducted a warrantless search of his vehicle and the backpack found inside the vehicle. He claims it was not a valid inventory search because the vehicle had not been properly towed or stored and had not been impounded. He further argues the search was clearly conducted as part of a criminal investigation, and therefore not a valid inventory search. He maintains that there was no public safety interest, as the car was parked on the shoulder of the roadway and not blocking traffic.

"Generally, law enforcement must obtain a warrant prior to conducting a search; however, there are certain exceptions to the warrant requirement," including an exception for an inventory search. **Commonwealth v. Lagenella**, 83 A.3d 94, 102 (Pa. 2013) (quoting **Commonwealth v. Petroll**, 738 A.2d 993, 998 (Pa. 1999)).

"The purpose of an inventory search is not to uncover criminal evidence, but to safeguard items taken into police custody in order to benefit both the

police and the defendant." *Id.* Inventory searches serve several purposes, including:

> (1) protection of the owner's property while it remains in police custody; (2) protection of the police against claims or disputes over lost or stolen property; (3) protection of the police from potential danger; and (4) assisting the police in determining whether the vehicle was stolen and then abandoned.

*Id.*

To determine whether a proper inventory search occurred, courts must determine "whether the police have lawfully impounded the automobile, *i.e.*, have lawful custody of the automobile" and "whether the police have conducted a reasonable inventory search." *Id.* at 102-03 (citation omitted). "An inventory search is reasonable if it is conducted pursuant to reasonable standard police procedures and in good faith and not for the sole purpose of investigation." *Id.* at 103 (citation omitted).

Here, the trial court concluded the officers conducted a permissible inventory search:

> Finally, having arrested [Grigger-Cross], and also the other adult occupant of the vehicle, now essentially abandoned by the side of the road; the trooper inventoried the contents of the car to secure them, finding additional controlled substances and drug paraphernalia in a backpack in the backseat. In the circumstances, with the occupants removed and the car destined for towing and impoundment, the trooper acted properly and violated no rights of [Grigger-Cross] in searching the car. *See S Dakota v. Opperman*, 428 U.S. 364 (1976) (holding that routine inventory search of defendant's locked automobile that had been lawfully impounded did not involve an "unreasonable" search in violation of the Fourth Amendment); *see also*

> ***Commonwealth v. Brandt***, 244 Pa. Super. 154, 366 A.2d
> 1238 ( 1976) (holding warrantless inventory search of car
> was not *per se* unreasonable absent showing of probable
> cause), construed in ***White***, 543 Pa. at 57, 669 A.2d at 903
> ("***Brandt*** . . . held that an inventory search is permissible
> when the vehicle is lawfully in the custody of police and
> when police are able to show that the search was in fact a
> search conducted for the purposes of protection of the
> owner's property while it remains in police custody;
> protection of the police against claims of lost or stolen
> property; and protection of the police against danger.").

Trial Ct. Op. at 29.

The court did not abuse its discretion. The officers were arresting Grigger-Cross and his passenger and impounding the car, such that they conducted a lawful inventory search. The search was not solely to search for evidence. To the extent Grigger-Cross argues the police had to tow the car to a secure location prior to conducting a search, he waived this issue by not raising it before the trial court. Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Judgement of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/16/2024

- 13 -